**UNITED STATES of America,
Plaintiff,**

v.

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE, Andrei Shleifer, and Jonathan Hay, Defendants.**

No. CIV.A.00–11977–DPW.

United States District Court,
D. Massachusetts.

June 28, 2004.

Elizabeth A. Adinolfi, Dorothy J. Aronovich, Skadden, Arps, Slate, Meagher & Flom, New York, NY, James R. Carroll, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Jonathan L. Frank, Vincent Tortorella, Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Jonathan Hay, Defendant.

David J. Apfel, Roberto M. Braceras, Goodwin Procter, LLP, Boston, MA, Robert W. Iuliano, Harvard University Holyoke Center, Office of the General Counsel, Cambridge, MA, Anne Taylor, Harvard University Office of the General Counsel, Cambridge, MA, Paul F. Ware, Goodwin Procter LLP, Boston, MA, for The President And Fellows of Harvard College, Defendant.

Alicia Bentley, U.S. Department of Justice, Commercial Litigation Branch, Washington, DC, Sara M. Bloom, United States Attorney's Office, Boston, MA, Sara McLean, Department of Justice Civil Division, Washington, DC, Nancy Rue, United States Attorney's Office, Boston, MA, for United States of America, Plaintiff.

Elizabeth Helen Cleary, Nutter, McClennen & Fish, LLP, Boston, MA, for Andrei Shleifer, Defendant.

Adam B. Rowland, Swidler Berlin Shereff Friedman, LLP, New York, NY, Christopher J. Gunther, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Andrei Shleifer, Defendant.

Stephen R. Delinsky, Michael P. Flammia, Eckert Seamans Cherin & Mellott, LLC, Boston, MA, for Forum Financial Group, LLC, John Y. Keffer, Movants.

Theo Emery, Associated Press, Boston, MA.

Jonathan B. Leiken, Skadden, Arps, Slate, Meagher & Flom LLP, New York,

NY, for The President And Fellows of Harvard College, Andrei Shleifer, Elizabeth W. Hebert, Nancy Zimmerman, Defendants.

Earl H. Nemser, Swidler Berlin Shereff Friedman, LLP, New York, NY, Benjamin E. Rosenberg, Swidler Berlin Shereff Friedman, LLP, New York, NY, for The President And Fellows of Harvard College, Andrei Shleifer, Nancy Zimmerman, Defendants.

D. Lloyd MacDonald, Kirkpatrick & Lockhart, Boston, MA, for Elizabeth W. Hebert, Defendant.

Matthew T. Peloso, Swidler Berlin Shereff Friedman, LLP, New York, NY, Robert L. Ullmann, Nutter, McClennen & Fish, LLP, Boston, MA, for The President And Fellows of Harvard College, Andrei Shleifer, Defendants.

Lawrence S. Spiegal, New York, NY, David M. Zornow, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Andrei Shleifer, Jonathan Hay, Defendants.

*MEMORANDUM AND ORDER*

WOODLOCK, District Judge.

The United States seeks substantial damages arising from alleged improprieties in a government-sponsored Harvard project to assist Russia in developing capital markets and foreign investments. The government's contract with Harvard barred employees who were assigned to what was known as the "Russia Project" from conducting certain business and investment activity that could give rise to real or apparent conflicts of interest. The government contends that defendants Andrei Shleifer and Jonathan Hay, who were senior supervisory figures at the Russia Project, nevertheless wrongfully invested and conducted business in Russia, resulting in a breach of the contract by Harvard.

Moreover, the government contends that Harvard and the two employees thereafter knowingly caused documents to be submitted that falsely certified, in violation of the Federal False Claims Act ("FCA"), that Harvard was complying with the contract, and that these documents had the practical effect of inducing continued payments to Harvard. The matter is now before me on cross motions for summary judgment.

## I. BACKGROUND

### A. Facts

In October 1992, Congress enacted the Freedom for Russia and the Emerging Eurasian Democracies and Open Market Support Act of 1992. 22 U.S.C. §§ 5801 *et seq.* The Act authorized the United States Agency for International Development ("USAID") to implement a program to help the states of the former Soviet Union "work toward the creation of democratic institutions and an environment hospitable to foreign investment based upon the rule of law." 22 U.S.C. § 5811(6)(B).

In 1992, USAID entered into a Cooperative Agreement with the Harvard Institute for International Development ("HIID"), a Harvard University entity, to create a program to support the Russian reform effort. This program was referred to as the "Russia Project." The two parties signed a second Cooperative Agreement to continue the program's efforts, effective October 11, 1995.

#### 1. *The Cooperative Agreements*

The cover letter of the first Cooperative Agreement stated that the agreement was being made to the recipient "on condition that the funds will be administered in accordance with the terms and conditions as set forth in [an attachment entitled] 'Standard Provisions,' which have been agreed to by your organization." The cover letter

to the second agreement contained similar language. Included in the Standard Provisions of both agreements were the Regulations Governing Employees ("RGEs"). The RGEs contained a conflict of interest clause:

Other than work to be performed under this grant for which an employee is assigned by the grantee, no employee of the grantee shall engage directly or indirectly, either in the individual's own name or in the name or through an agency of another person, in any business, profession, or occupation in the foreign countries to which the individual is assigned, nor shall the individual make loans or investments to or in any business, profession or occupation in the foreign countries to which the individual is assigned.

The first Cooperative Agreement also required that the grantee "maintain a code or standards of conduct that shall govern the performance of its officers, employees or agents engaged in the awarding and administration of contracts using AID funds.... Such standards shall provide for disciplinary actions to be applied for violations of such standard by the grantees' officers, employees or agents." The second Cooperative Agreement similarly called for written standards of conduct governing real or apparent conflicts of interest.

The cover letter to the second Cooperative Agreement also stated that the award was being made "on condition that the funds will be administered in accordance with the terms and conditions as set forth in 22 C.F.R. § 226." That section provided:

The recipient shall maintain written standards of conduct governing the performance of its employees engaged in the award and administration of a contract supported by Federal funds if a real or apparent conflict of interest would be involved. Such a conflict would arise when the employee, officer, or agent, any member of his or her family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in the firm selected for an award. The officers, employees, and agents of the recipient shall neither solicit nor accept gratuities, favors, or anything of monetary value from contractors, or parties to subagreements. However, recipients may set standards for situations in which the financial interest is not substantial or the gift is an unsolicited item of nominal value. The standards of conduct shall provide for disciplinary actions to be applied for violations of such standards by officers, employees, or agents of the recipient.

22 C.F.R. § 226.42 (1995).

The requirement of written standards of conduct governing real or apparent conflicts of interest was satisfied by a conflict of interest provision in the HIID Overseas Manual. That provision prohibited "employees and members of their families" from engaging in any:

[F]inancial transactions or investments within the Project Country ... The only financial transactions that are permissible are the exchange of currency in legal markets, the purchase of goods and services, and the maintenance of bank accounts consistent with the provisions of this section.

The restriction against any financial transactions or investments in the Project Country arises because each HIID overseas group examines under official or semi-official auspices a wide range of local economic matters, knowledge of which at least presents the actual possibility or appearance of exploitation for

personal gain. For this reason, HIID does not permit or condone transactions by an Employee or by family members, even if legal, which might suggest a possible conflict of interest between the team's professional work and the private profit of team members.

Prohibited transactions or investments included "holding of debt instruments, maintaining any interest whatsoever in any local business, or making investments of any kind in the Project Country." Violation of the policy was grounds for "immediate dismissal."

### 2. Project Supervisors

**Andrei Shleifer** served as a Project Director of the Russia Project throughout the two agreements. Under the second agreement, he was the sole Project Director. Shleifer is a tenured Professor of Economics at Harvard University in Harvard's Faculty of Arts and Sciences. He is married to Nancy Zimmerman who, during the time relevant to this litigation, managed a hedge fund known as Farallon Fixed Income Associates.

During the period of the second Cooperative Agreement, Shleifer also held the title of Principal Investigator. Rosanne Kumins, the Assistant Director for Contract Administration at HIID, also referred to Shleifer as the project "Backstopper," meaning the "responsible senior person in Cambridge."

Shleifer engaged in some administrative tasks as Project Director, including the recruitment and selection of personnel. Shleifer recalls that "quarterly reports were shown to [him] for comments periodically" throughout his time on the Project. He also signed "Principal Investigator Approval" for at least one subcontractor agreement under the second Cooperative Agreement. Within the Project's operations, it was considered appropriate to approach Shleifer, among others, for advice regarding conflict of interest issues.

**Jonathan Hay,** a Harvard Law School graduate, was a Moscow-based employee of the Russia Project as of January 1993. By the second quarter of 1993, Hay was a Project Associate, and from October 1995 on, he was the Project's General Director. As General Director, he led a program to coordinate legal reform assistance, known as the Legal Reform Project, which officially began in July 1994 through an amendment to the first Cooperative Agreement. In a memo to USAID, Hay identified himself as the Legal Reform Project's principal liaison to USAID in Moscow.

The Institute for Law–Based Economy ("ILBE"), a subcontractor of the Legal Reform Project, was a Russian non-profit organization that provided substantive and administrative support for the Legal Reform Project. Hay exercised some oversight over the ILBE project and approved invoices for payment indicating that he was "aware of" and "agree[d] with" charges that ILBE submitted to the Legal Reform Project.

Hay was HIID's top advisor in Moscow and was charged, according to an HIID draft of the 1997 workplan, with "the overall development, management and implementation of HIID's program ... He report[ed] only to Mr. Shleifer." Kumins referred to Hay as the Project's "chief of party," meaning that he was "responsible for the workings of the Moscow office." Hay, however, does not recall the term "chief of party" being used in connection with the Project.

As of late 1995 or early 1996, Hay was involved in a romantic relationship with Elizabeth Hebert.[1] Hebert operated the

---

1. They later married.

Pallada Asset Management Company ("Pallada"), a mutual fund management company that, in August 1996, became the sixth company to receive an operating license from the Russian Federal Commission on Securities and the Capital Market (the "Commission"). In September 1996, Pallada was the first such company in Russia to register its mutual fund with the Commission.

### 3. *The USAID Investigation*

In early 1997, USAID's Inspector General began an investigation into alleged conflicts of interest by Hay and Shleifer. Harvard first learned of the investigation in April 1997. On or about May 20, 1997, USAID temporarily suspended the Project. The Russian government suspended it on the same or next day. On May 23, 1997, HIID terminated Hay's employment for violating HIID's conflict of interest policy, and removed Shleifer (who retained his position in the Department of Economics) from the Russia Project. USAID permanently terminated the Project on June 6, 1997.

### B. Procedural History

On September 26, 2000, the United States filed a complaint alleging eleven distinct legal claims against Harvard, Shleifer, Hay, Hebert, and Zimmerman. Three claims arose from the False Claims Act, 31 U.S.C. §§ 3729(a)(1)-(3), and the other eight arose from various common law theories. I granted Hebert and Zimmerman's motions to dismiss all claims against them. I also granted the remaining defendants' motions to dismiss Count V (breach of fiduciary duty), Count X (aiding and abetting), and Count XI (civil conspiracy). Finally, I bifurcated two of the government's claims, Count VII (payment by mistake) and Count IX (unjust enrich-

ment and disgorgement), and postponed their consideration to a remedy phase.

### II. DISCUSSION

Six claims remain for potential resolution on summary judgment: Counts I (false claims under 31 U.S.C. § 3729(a)(1)), II (false statements under 31 U.S.C. § 3729(a)(2)), III (conspiracy under 31 U.S.C. § 3729(a)(3)), IV (common law fraud), and VIII (fraudulent inducement), all of which were pled against all three remaining defendants, and Count VI (breach of contract), pled against Harvard only. Though the government places the FCA claims first and foremost, all the claims ultimately arise from the alleged violation of the RGEs. Because Count VI (breach of contract) turns on the same factual, legal, and interpretative questions concerning the alleged violation of the RGEs that underlie all the other remaining claims, yet lacks the additional elements that the other claims require, I analyze Count VI first, and then build from there.

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995), *cert. denied,* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). Once the movant has made such a showing, the nonmovant must point to specific facts demonstrating that there is, indeed, a trialworthy issue. *Id.*

A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000), and a "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." *Triangle Trading Co., Inc. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir.1999) (quoting *Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, 427 (1st Cir.1996)). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

In this case, which involves both the interpretation of Cooperative Agreements drafted by the government and a factual determination whether certain transactions violated conflict of interest provisions in those agreements, two additional principles apply. In construing the agreements, the rule of *contra proferentem* requires that latent ambiguity in a government agreement be construed against the government as the drafter. *WDC W. Carthage Assocs. v. United States,* 324 F.3d 1359, 1364 n. 2 (Fed.Cir. 2003). On the other hand, in determining whether a transaction by a defendant subject to the conflict of interest provisions in fact violated those provisions, a court is informed by the maxim that "[m]en must turn square corners when they deal with the Government." *Rock Island, Ark. & La. R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920) (Holmes, J.).

## B. Count VI: Breach of Contract

The government claims that, while working on the Russia Project, Shleifer and Hay invested and conducted business in breach of the Cooperative Agreements. The government argues that Harvard is liable for their breach because the Cooperative Agreements are enforceable contracts.

Liability for breach of contract requires: (1) a valid contract, (2) an obligation or duty arising out of that contract, (3) a breach of that duty, and (4) damages caused by the breach. *Flathead Joint Bd. of Control v. United States,* 30 Fed. Cl. 287, 294 (1993), *aff'd,* 59 F.3d 180, 1995 WL 380585 (Fed.Cir.1995). For the reasons discussed below, I find that the Cooperative Agreements were valid contracts between Harvard and USAID, that they created an obligation to remain free of conflicts of interest, and that actions by Hay and Shleifer breached that duty.[2]

### 1. *Harvard is a Party to the Cooperative Agreements, Which Are Valid Contracts*

### a. The Cooperative Agreements are Contracts

The two Cooperative Agreements in this case were entered into subject to the Fed-

---

**2.** I will leave the determination of damages for the remedy phase of this proceeding. The government contends that the conflicts of interest rendered HIID's advice to Russia worthless, and that the United States is therefore entitled to, at minimum, single damages equal to all sums paid once Shleifer and Hay began investing in violation of the RGEs. Because of its theory of damages, the government argues that defendants are not entitled to an offset for the value or benefit of the advice provided, and therefore damages-oriented discovery is neither necessary nor useful, because valuing the benefit of the advice provided is impossible. Defendants argue that the government must prove actual harm, and that an offset for the value of services rendered is both proper and readily calculable. I will set the issue of the appropriate measure of damages down for hearing as part of a scheduling order accompanying this Memorandum.

eral Grant and Cooperative Agreement Act of 1977, 31 U.S.C. §§ 6301 *et seq.* ("FGCAA"). The FGCAA distinguishes between three types of instruments: cooperative agreements, grant agreements, and procurement contracts. Whether a FGCAA cooperative agreement can constitute a valid contract has generated some litigation.

The defendants rely heavily on the trial court's decision in *Trauma Service Group, Ltd. v. United States,* 33 Fed. Cl. 426 (1995) ("*Trauma I* "), *aff'd on other grounds,* 104 F.3d 1321 (Fed.Cir.1997) ("*Trauma II* "). *Trauma I* held that cooperative agreements are not contracts because the FGCAA specifically provides for the creation of separate contractual undertakings: procurement contracts. Likening the agreement at issue in *Trauma I*—a Memorandum of Agreement ("MOA")—to a cooperative agreement, the trial court held that a "cooperative agreement or assistance agreement is not a contract." *Id.* at 429 (citing *Council on Envt'l Quality,* 65 Comp. Gen. 605, 605–07 (1986)).

The Federal Circuit has twice criticized this aspect of the *Trauma I* decision, albeit in dicta. *See Trauma II,* 104 F.3d at 1326; *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319–20 (Fed.Cir.1997), *cert. denied,* 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997).[3] In *Trauma II,* the Federal Circuit stated that "contrary to the opinion of the trial court, a MOA can also be a contract—whether this one is, we do not decide." 104 F.3d at 1326. It observed that any agreement with the government can be a contract if it meets the following requirements: "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Id.* at 1326.

I agree with the opinions criticizing the *Trauma I* court's reasoning. The *Trauma I* court failed to consider that the FGCAA's definition of procurement contracts was not intended to classify other types of agreements as non-contractual. *See* Jeffrey C. Walker, Note, *Enforcing Grants and Cooperative Agreements as Contracts Under the Tucker Act,* 26 Pub. Cont. L.J. 683, 696 (1997). That the purpose of a cooperative agreement is assistance and not procurement is not dispositive of the determination of whether a cooperative agreement is a contract. *Thermalon Indus.,* 34 Fed. Cl. at 417–18. An " 'agreement' is broader in scope than [a] 'contract' in that agreements encompass both contracts, and arrangements that do not qualify as contracts." *Id.* (internal citations omitted). "Therefore, Congress' use of the term 'agreement' in the [FGCAA] to describe a grant relationship cannot reasonably be interpreted as an indication that Congress intended for all grant agreements not to constitute contracts . . . ." *Id.*

■ Here, the Cooperative Agreements between Harvard and USAID constitute contracts to assist Russia in developing capital markets and foreign investments. By their signatures to the contracts, both parties received a benefit and a burden.

---

**3.** Another judge of the Court of Federal Claims has declined to follow *Trauma I* 's position that cooperative agreements are not contracts. In *Thermalon Industries v. United States,* 34 Fed. Cl. 411, 418 & n. 4 (1995), decided just six months after *Trauma I,* the court held that the FGCAA did *not* establish that agreements other than procurement contracts are not enforceable contracts, and emphasized that "[t]o the extent that this interpretation of the [FGCAA] is inconsistent with the analysis in [*Trauma I* ], this court respectfully disagrees with that analysis." I note that the Federal Circuit cited *Thermalon* approvingly on this point. *Trauma II,* 104 F.3d at 1320, 1326.

USAID did not enter into the Cooperative Agreements with HIID merely for the benefit of Russia. *Cf. United States v. Thomas B. Bourne Assocs.*, 367 F.Supp. 919, 921 (E.D.Pa.1973) (finding no pecuniary interest in a USAID program to finance improvements to an airport in British Guiana). The government undoubtedly sought to benefit economically and otherwise from the facilitation of Russia's transition to a market economy through privatization. *Cf. Quiman, S.A. de C.V. v. United States*, No. 98–5036, 1999 WL 44182 (Fed.Cir. Jan.21, 1999) (finding a cooperative agreement under which the Department of Agriculture would provide inspectors for Quiman's facilities, and Quiman would help defray expenses of the inspections, was not too indefinite to constitute an enforceable contract and should not fail for lack of consideration).

### b. Harvard is a Party to the Agreements

Harvard maintains that HIID was the only grantee under the Cooperative Agreements, while the United States insists that Harvard itself is the grantee and therefore bound by the contracts. At the outset, it is important to outline precisely what is at stake in this particular dispute, and to separate two similar but logically distinct legal relations. Whether Harvard · or HIID is the *grantee* for purposes of the RGEs is mainly relevant to whether Shleifer—whose status as an "employee of the grantee" is disputed—was covered by the RGEs. Resolution of that question turns on the text of the Cooperative Agreements, the federal regulations governing such agreements, and (to a lesser extent) the contemporaneous understandings of USAID and Harvard. On the other hand, whether Harvard or HIID (or both) is a *party* for purpose of contractual liability is a much simpler question turning on Harvard's and HIID's respective legal capacity

to make contracts and be bound by them. Put differently, the "grantee" dispute concerns whether Shleifer could have violated the RGEs, while the "party" dispute concerns whether the United States can sue Harvard for breach of contract for such violations.

### i. "Grantee"

■ The Shleifer and Harvard arguments are primarily based on the text of the Cooperative Agreements and the statutory and regulatory framework that creates the legal relation of "grantee" in the first place. The government's arguments, by contrast, are primarily based on the operational reality of HIID's status as a division of Harvard and how various intra-Harvard entities, including HIID, interacted to process the grant application and other paperwork.

The government first argues that HIID *could not possibly* be the sole recipient under the Cooperative Agreements, because it is not a separate legal entity from Harvard, and has no power to make contracts on its own separate behalf. *See In re Sugar Indus. Antitrust Litigation*, 579 F.2d 13, 18 (3d Cir.1978) ("A division of a corporation is not a separate entity but is the corporation itself."). The statutes are somewhat unclear on whether an unincorporated internal division of a university may qualify as a recipient of a USAID cooperative agreement. Under the FGCAA's scheme, the recipient here qualifies as an "other recipient," defined as "a person or recipient (except a State or local government) authorized to receive United States Government assistance or procurement contracts and includ[ing] a charitable or educational institution." 31 U.S.C. § 6302(4). While some aspects of this definition—reference to "person" and "institution"—seem to suggest that the recipient must be a separate jural entity, other as-

pects—the incorporation by reference of unspecified "authori[ty] to receive United States Government assistance or procurement contracts"—suggest a broader view. In fact, Harvard contends that such "authority" may be found in the Foreign Assistance Act of 1961, 22 U.S.C. §§ 2295 *et seq.*,[4] which provides that the government may "make and perform agreements and contracts with, or enter into other transactions with, any individual, corporation, or *other body of persons.*" 22 U.S.C. § 2395(b) (emphasis added). Taken as a whole, the statutory text suggests that Congress intended to allow USAID to designate, as recipient of a cooperative agreement, something less than a distinct legal entity.

USAID's regulations support this point by what they do *not* say. Nearly thirty federal agencies, in their regulations concerning cooperative agreements, include a standard definition that "[t]he grantee is the entire legal entity even if only a particular component of the entity is designated in the grant award document." *E.g.*, 7 C.F.R. § 3016.3 (Department of Agriculture), 10 C.F.R. § 600.202 (Department of Energy), 13 C.F.R. § 143.3 (Small Business Administration), 14 C.F.R. § 1273.3 (NASA), 15 C.F.R. § 24.3 (Department of Commerce), 20 C.F.R. § 437.3 (Social Security Administration), 21 C.F.R. § 1403.3 (Office of National Drug Control Policy), 22 C.F.R. § 135.3 (Department of State), 42 C.F.R. § 67.11 (Public Health Service).[5] USAID's regulations, tellingly, do not.[6] Nor does its handbook, which simply defines recipient as "any foreign or domestic nongovernmental entity which receives a grant or agreement from AID." (Ex. 318, at 11 § 1F.5.)

The United States was evidently not troubled by HIID's lack of separate legal status when it entered into the Cooperative Agreements, which specifically identify HIID as the "Recipient."[7] (Ex. 15, at 1; Ex. 245, at 5; *see also* Ex. 322.) Ordinarily, this might end the analysis. However, during the lifetime of the Cooperative Agreements, Harvard did not seem as insistent that HIID (and only HIID) was the recipient as it does now for purposes of this litigation. The record shows that Harvard had ultimate responsibility for the administration of the agreements, and non-HIID personnel were frequently involved in that administration.

The second Cooperative Agreement was signed by the Associate Director of the Office of Sponsored Research ("OSR") on

4. The Foreign Assistance Act of 1961 is explicitly referred to by the Emerging Eurasian Democracies and Open Market Support Act of 1992. *See* 22 U.S.C. §§ 5812(a)(2), (4), 5812(b)(1).

5. All but one of the regulations containing this "entire entity" rule apply to government, not private, grantees. *See* 42 C.F.R. § 67.11. However, the point is that the United States had available to it perfectly acceptable language which it had repeatedly promulgated without modification, and which would have conclusively determined this issue in its favor, had it been promulgated for USAID.

6. While the record does not explain why USAID has not promulgated such a rule, there could be rational reasons for not doing so. It could be that USAID recognizes that its grantees are often smaller units of larger organizations, and finds that the best balance of efficiency in obtaining services and impartiality of advice can be achieved by allowing such organizations to name the smaller unit (e.g., HIID) as the grantee, and occasionally reach into the larger organization (e.g., Harvard) for further expertise without burdening such experts (e.g., Shleifer) with the RGEs. Harvard could have reasonably relied on this scheme in naming HIID as the Recipient in the Cooperative Agreements.

7. Under USAID rules, "recipient" and "grantee" are synonymous. (Ex. 346, at 19; USA Ex. FF, at 1 n. 1; Yeandel 188.)

behalf of Harvard.[8] The document entitled "Certifications, Assurances, and Other Statements of Applicant/Grantee to USAID" for the second Cooperative Agreement identifies the "Applicant/Grantee" as "HIID" on the cover page, "Harvard University (HIID)" on another, and "President and Fellows of Harvard College" on the signature line. (Ex. 427 at 111, 115, 128.) That document states that the grantee "operates as a corporation under the laws of Massachusetts ... [and] a private college or university." (*Id.* at 128.) The document was signed by Kathleen Mercier of OSR.[9] (*Id.*) Indeed, Rosanne Kumins, HIID's Assistant Director of Contract Administration, once informed Shleifer that "[s]ince the grantee is the President and Fellow [sic], this [clause in the Cooperative Agreements] refers to all University employees." (Ex. 383.)

Harvard often represented to the United States that it was the recipient. OSR representatives regularly signed and submitted to USAID three types of financial forms used to process Russia Project funds: Form SF–272, known as Federal Cash Transaction Reports ("FCTRs"), and Form 5805, known as Requests for Funds, were submitted monthly, and Form SF–269, known as Financial Status Reports ("FSRs"), were submitted quarterly. Most of these forms list the "Recipient Organization" as "President and Fellows of Harvard College." (*E.g.*, Ex. 65.)

In the picture that emerges, operational reality was not always subject to tidy legal categories. HIID did the actual work under the Cooperative Agreements, but other offices within Harvard (mainly OSR) handled much of the paperwork. There is little evidence that anyone at either Harvard or USAID paid thoughtful attention to whether HIID or Harvard was the recipient, presumably because HIID is in fact part of Harvard, and because the one issue where it appears to matter (the scope of the RGEs) was not salient at the time. Even after this litigation had commenced, Harvard deposition witnesses frequently contradicted themselves, and one another, as to whether Harvard or HIID was the recipient. (*See, e.g.*, Kumins 49 ("Harvard is the recipient of the project. The grantee and executing agency is HIID."); Mora 12, 15.) The impression formed from the deposition transcripts is not that the witnesses are evading the question, but rather that they themselves are genuinely confused.[10]

Given these facts, I cannot dispose of the issue by simply quoting the recipient identification in the Cooperative Agreements and ignoring the reality of how Harvard and HIID interpreted those agreements when they were formed. The government's position (in its role as litigator) is essentially that Harvard did not strictly enforce boundaries between HIID and OSR in the performance of the agreements, or even in the paperwork necessary to form the agreements in the first place. On the other hand, the government (in its

---

8. The copy of the first Cooperative Agreement in the record is not signed. I note, however, that Hay's 1992 employment agreement is between Hay and the "President and Fellows of Harvard College" and references "an Agreement which has been concluded between the President and Fellows of Harvard College" and USAID.

9. The portion of the certification statement for the first Cooperative Agreement in the record does not provide information about the recipient organization.

10. While the witnesses themselves do not appear duplicitous, portions of Harvard's argument identifying HIID as the grantee and explaining away contrary evidence smack of a shell game in which the identity of the grant recipient changes depending on what question the government asks.

role as regulator) conspicuously declined to promulgate an "entire entity" rule for USAID cooperative agreement recipients as it did for other agencies' cooperative agreement recipients. While Harvard's internal systems for dealing with USAID were sufficiently tangled that *Harvard could not always give a straight answer as to who the recipient was*, the fact remains that, in the most important legal documents, the *government* almost invariably identified HIID as the recipient.[11]

Based on the Cooperative Agreements' identification of HIID as the recipient, the statutory and regulatory framework that both permits agencies to name entities without an independent legal existence as grantees, and under which USAID declined (and apparently continues to decline) to promulgate a contrary "entire entity" rule, I find that HIID is the sole recipient under the Cooperative Agreements. Harvard's muddled self-identification in its paperwork filed with the government does not overcome the plain identification of HIID as the recipient in the agreements, and the government cannot through this litigation create an "entire entity" rule for USAID recipients that it declined to create in its regulations and administrative documents.[12]

### ii. Party

■■ It is much simpler to determine whether Harvard was an entity contractually liable for breach of the agreements. Within Harvard's internal structure, only OSR was authorized to sign cooperative agreements, and when it did so, it signed on behalf of the President and Fellows of Harvard College. (Mora 10–11.) Furthermore, because HIID is not a distinct legal entity, suing HIID means suing Harvard. "[A]n unincorporated division cannot be sued or indicted, as it is not a legal entity." *United States v. ITT Blackburn Co.*, 824 F.2d 628, 631 (8th Cir.1987). Because agents with the actual authority to contract on behalf of Harvard entered into the Cooperative Agreements, Harvard is liable for any breach committed by HIID personnel.

### 2. *Application of the Regulations Governing Employees to Hay and Shleifer*

■ The government contends that RGEs applied to both Hay and Shleifer, as employees of the grantee, Harvard University. It is undisputed that Hay was a HIID employee assigned to Russia from January 1, 1993 through April 1997. As such, both the RGEs and the "Conflict of Interest and Illegal Transactions" provision in the HIID Overseas Manual applied to Hay.

■ Shleifer, however, argues that he was not subject to the RGEs, which applied to "employees," because he was only a *consultant* to HIID, not an employee.[13] This dispute obviously turns on whether Harvard or HIID is the "grantee" for purposes of the RGEs: if Harvard is the grantee, then Shleifer—undisputedly an employee of Harvard University—is an

---

11. In addition to the formal documents, USAID personnel generally identified HIID, not Harvard, as the recipient. (Norris 288–91, Ward 154–56.)

12. Harvard also argues that the grantee could not have been Harvard because then the RGEs would apply to *all* university employees somehow involved in working with or in Russia, e.g., Divinity School faculty completely

unconnected with HIID's Russia Project work. This is untrue, because such employees would not be "assigned" to Russia within the meaning of the RGEs.

13. Shleifer separately disputes that he was subject to the HIID Overseas Manual because he was not posted overseas.

employee of the grantee. On the other hand, if HIID is the grantee, then whether Shleifer was subject to the RGEs depends on whether he was a consultant to HIID (as he maintains) or an employee of it (as the government maintains).

Since I have determined that HIID was the sole recipient/grantee under the Cooperative Agreements, Shleifer was only subject to the RGEs if he was an employee of HIID. This is because the RGEs specifically apply to "employee[s] of the grantee." (Ex. 15, at 62.) Were there any doubt as to whether consultants were somehow subsumed into this provision, it would be quelled by examination of two other virtually identical regulations that USAID has adopted. First, an earlier version of the standard RGEs explicitly applied to a "regular or short term employee *or consultant* of the Grantee." (Ex. 347, at 19 § 21(c) (emphasis added).) Second, USAID's parallel restrictions for services procurement contracts continue to apply to an "employee *or consultant* of the contractor." 48 C.F.R. § 752.7027(e) (emphasis added). The fact that USAID removed the consultant restriction from the pre-1985 version of the standard RGEs applicable to cooperative agreements, yet left it in the procurement contract RGEs, leads to the inference that USAID intended consultants to be exempt from the RGEs.

I must therefore turn to whether Shleifer was an employee of, or a consultant to, HIID. Whether a worker is an employee or an independent contractor is a question that has recurred in the decisions of state and federal courts for over a century, in such diverse areas of law as workers compensation, collective bargaining, taxation, and even intellectual property. *See, e.g., Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 752–53, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (determining that sculptor was independent contractor, not

employee, for purposes of Copyright Act); *NLRB v. United Ins. Co.*, 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968) (under National Labor Relations Act, courts must apply common law agency test to distinguish employee from independent contractor). In the absence of a specific definition of "employee" or "consultant" in the RGEs, I find that the common law test for distinguishing an employee from an independent contractor applies.

 Under the common law, an employee (or servant) is "an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master," whereas an independent contractor is one "who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." *Restatement (Second) of Agency* §§ 2(2)-(3). Factors for determining whether one is an employee or an independent contractor include:

> the hiring party's right to control the manner and means by which the product is accomplished ... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Community for Creative Non–Violence,* 490 U.S. at 751–52, 109 S.Ct. 2166; *see also Restatement (Second) of Agency* § 220(2) (similar factors); Rev. Rul. 87–41, 1987–1 C.B. 296, 298–99, 1987 WL 419174 (similar factors). Furthermore, "if the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial." Rev. Rul. 87–41.

Application of these factors in this case is complicated by two issues. First, Shleifer was undisputedly a *Harvard* employee; the only dispute is whether he was employed at least partially by the HIID division of Harvard, or just by the Faculty of Arts and Sciences. This is completely unlike the typical case, where the worker has just one relationship to the employer. Second, an examination of Shleifer's daily regimen at HIID (what work to do, as well as when and where to do it) must be tempered by the knowledge that his ordinary, *non-HIID* role was that of a tenured academic, a job description as flexible and autonomous as any employee position in our society.

The government's main argument is that Shleifer was an employee of HIID because the income he was paid by HIID was typically described in correspondence as "salary," and he reported it on his income tax return as "wages." In fact, he had income tax withheld and reported to the Internal Revenue Service on Form W–2 (the form used for payments to employees); HIID never issued him a Form 1099, which would be used for an independent contractor.[14] Perhaps most importantly, Shleifer was in charge of the entire Russia Project, and classifying him as a consultant would result in the anomalous circumstance that the head of the project was exempt from the conflicts of interest regulations, whereas a clerical employee would be subject to them.

Shleifer's main argument is that his memoranda of understanding with HIID consistently described him as a "consultant," never an employee.[15] Furthermore, Shleifer generally maintained some degree of separation between himself and HIID. He at all times remained an employee of Harvard's Faculty of Arts and Sciences, and retained his position in the Department of Economics; all his work for HIID was done from his Department of Economics office, using his secretary and resources there, and he never obtained an office at HIID's building; his administrative contact at HIID was always the person responsible for dealing with consultants, not the person responsible for dealing with HIID employees; and, internally, he always remained on the Faculty of Arts and Sciences payroll, even when the Faculty charged his salary to a HIID account.

Shleifer did maintain a careful separation between himself and HIID, in some ways much more of a separation than independent contractors in other fields, who often work at the employer's offices and under fairly direct control. However, Shleifer's unique role at HIID, and both his own and Harvard's contemporaneous

---

14. At his request, Shleifer also received benefits from HIID.

15. These documents, executed by Shleifer and the President and Fellows of Harvard College, commit Shleifer to be a "consultant ... to the Agency for International Development," not to HIID. Moreover, the MOAs that HIID and Shleifer executed are distinct from the "Consulting Services Agreements" that HIID used for true outside contractors, such as Michael Butler. Those agreements specifically provide that "the status of the Consultant shall be that of an independent contractor and not that of an agent or employee"—language conspicuously missing from Shleifer's MOAs.

description of his income as "wages" or "salary," suggest an employee relationship. While Shleifer's "consultant" status ·at HIID appears to have some real significance in Harvard's internal financial and time-allocation system, by which his salary was charged to various accounts of the same entity, the evidence indicates that the distinction was purely Harvard-internal, with no legal significance as against the outside world. Indeed, on the only occasions that Shleifer (or Harvard) appear to have had to categorize Shleifer's status vis-à-vis HIID to a non-Harvard entity—submission of tax forms to the Internal Revenue Service—he was represented as an employee, never an independent contractor.[16] For these reasons, I find no genuine dispute of material fact as to Shleifer's status as an employee of HIID.

 Shleifer also argues that the RGEs do not apply to any investments he made while Project Director because the regulations govern investments only "in the foreign countries to which the individual is assigned," and he was not "assigned to" Russia. I find that this issue cannot be resolved on summary judgment because the phrase "assigned to" is ambiguous.

 "[A] contract is ambiguous only when its terms lend themselves to more than one reasonable interpretation." *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996). The Cooperative Agreements do not define the phrase "in the foreign countries to which the individual is assigned." Because the provision refers to "foreign *countries*" to which a single "individual" is assigned, it cannot require full-time residence in the country or countries of assignment. It could reasonably require at least part-time residence, however.

The RGEs certainly suggest that they are meant to apply only to employees stationed overseas. The pre–1985 version of the RGEs was found under the heading "Regulations Governing Employees Outside the United States." (Ex. 347,. at 19 § 21.)[17] Similarly, the conflict of interest provision in both Cooperative Agreements immediately follows a provision restricting "sale of personal property or automobiles by grantee employees ... in the foreign country to which they are assigned" and precedes a provision requiring "[t]he grantee's employees, while in a foreign country, ... to show respect for its conventions, customs, and institutions, [and] to abide by its applicable laws and regulations." (Ex. 15, at 62 §§ 21(b), (d).) These provisions, which surround the clause at issue here, suggest that they only apply to employees physically stationed overseas. Finally, the RGEs provide that, if an employee violates them, and the grantee determines that the employee should be terminated, "the grantee shall

16. While I recognize that tax treatment is only one of the factors in the employee/contractor test, it is particularly persuasive under these circumstances. Typically, one who has been treated by an employer as an independent contractor for tax purposes (because it is more favorable to the employer) is later claimed (either by the employee, or the Internal Revenue Service) to be an employee. Rare is the case where both the worker and the employer treat the relationship as employee for tax purposes, but then later claim that he was an independent contractor.

17. Shleifer presumably never saw this earlier version, so it could not have informed his understanding. Furthermore, the fact that this heading does not appear in the Cooperative Agreements could lead to an inference that USAID, by not including it, intended the RGEs to apply to employees within the United States. That said, I find that the heading in the pre–1985 standard RGEs contributes to ambiguity as to whether the RGEs apply to stateside employees.

use its best efforts to cause the return of such employee to the United States, or point of origin, as appropriate." (*Id.* § 21(g).) This provision—which can also be triggered by a decision of "the U.S. Ambassador to direct the removal from a country of any U.S. citizen" (*id.* § 21(f))—clearly contemplates that the employee is stationed overseas.

If the phrase "assigned to" is defined as "residing in," then the RGEs would not apply to Shleifer. Shleifer lived and was stationed in Massachusetts. He was referred to as part of the "Cambridge Staff" as opposed to the "Field Staff." Although Shleifer filled out Overseas Assignment Forms for work done in both Russia and Cambridge, he also filled out Local Assignment Forms for work done in Massachusetts. In December 1994, Shleifer wrote a memo to senior staff on the Russia Project stating that he was the "head of the project in Cambridge."

Nevertheless, "the foreign countries to which the individual is assigned" could reasonably refer to those countries in which there are *projects* to which an individual is assigned.[18] This interpretation has the advantage of being consistent with the government's intent in writing a conflict of interest provision in the first place: It would be quite unusual for the government wholly to exempt stateside employees from conflict of interest requirements, and to communicate this important exemption solely by a subtle interpretation of the word "assigned."[19] Based on that reading of "assigned to," Shleifer would be "assigned to" Russia because of his work on the Russia Project.

Because "assigned to" may reasonably be interpreted to have either one of the two meanings discussed above, I find that it is an ambiguous term. If a court determines that a contractual term is ambiguous, it may examine extrinsic evidence to resolve the ambiguity. *Torres Vargas v. Santiago Cummings,* 149 F.3d 29, 33 (1st Cir.1998). Summary judgment is only appropriate if "the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." *Bank v. IBM,* 145 F.3d 420, 424 (1st Cir. 1998); *Torres Vargas,* 149 F.3d at 33. If, however, "the extrinsic evidence relevant to the interpretation of an ambiguous contractual provision is contested or contradictory, summary judgment will often be inappropriate." *Torres Vargas,* 149 F.3d at 33 (internal quotation marks omitted).

The parties have pointed to extrinsic evidence of USAID's interpretation of the phrase "assigned to." Various USAID personnel understood that to be assigned to a country meant to be "resident with the AID mission." (*See, e.g.,* Ballantyne 7, 9 (personnel are not "assigned" to a country even if they visit it four or five times a year for up to two weeks at a time); Ward 176 (to be "assigned in" a country means there is a standard form "assigning you there.").) On the other hand, Orion Yeandel, a Moscow-based USAID contract officer responsible for the negotiation, formation, and administration of cooperative agreements from 1995 to 2000, interpreted the provision to prohibit "investing in the country that they are working in." (Yeandel 221.) A 1998 e-mail from Kathleen

---

**18.** Note also that the first phrase in the clause refers to "*work* to be performed under this grant for which an employee is assigned," which suggests that "assigned" can refer to work as well as to physical location. (Ex. 15, § 21(c), at 62 (emphasis added).)

**19.** On the other hand, the interpretation of "assigned" as referring to projects, not residence, has the disadvantage of requiring the third clause of a seven-clause provision to be read differently than the other six clauses.

O'Hara of USAID clarifying the Regulations Governing Employees in connection with a USAID grant to the University of Alaska stated that the RGEs apply "only to those employees who are actually working in Russia and are funded by the grant." (Rosenberg Aff. Ex. I.)

This extrinsic evidence does not resolve the meaning of "assigned to" because it does not fully elucidate the intent of the parties at the time that they entered into the agreement. *See Lanier Prof'l Servs., Inc. v. Ricci*, 192 F.3d 1, 4 (1st Cir.1999) (listing factors for determining parties' contemporaneous intent). Therefore, because the term "assigned to" is ambiguous, and because neither party has provided extrinsic evidence decisively resolving the ambiguity, the issue cannot be determined on summary judgment.[20] In sum, I find that there is sufficient dispute as to whether Shleifer was "assigned" to Russia to create a genuine issue of material fact as to whether he was covered by the RGEs.

### 3. *Hay and Shleifer's Investments Breached the Cooperative Agreements*

Having established that valid contracts exist, and that Hay, at least, was subject to the terms of those contracts, I now consider whether Hay's investments materially violated the Cooperative Agreements so as to effect a breach of contract.[21] As noted above, although the breach of contract

claim may not ultimately turn on Shleifer's investment activity, for the purposes of determining liability under the False Claims Act in Parts II.C, D, and E, I will also consider whether Shleifer's actions will have violated the agreements if he is found to be subject to the RGEs.

The government alleges that Hay and Shleifer engaged in a variety of business and investment activities, and that several of these investments and activities violated the RGEs. Hay and Shleifer did attempt to structure several transactions so as to circumvent the conflict of interest provision in the RGEs, either by ensuring that money was not literally transferred within Russia, or by passing money through intermediate parties. In deciding whether these attempts were successful exploitations of legitimate loopholes or contrivances in breach of known obligations, I am mindful of the weighty purpose of the RGEs: avoiding conflicts of interest where staff with an important role in shaping the Russian economy also have a private interest in particular aspects of that economy.

#### a. Hay's Investments

##### i. Russian oil stocks

■ In the summer of 1994, Shleifer invited Hay to invest in Russian oil stocks with him. According to Hay, Shleifer told Hay that Shleifer was considering having an interest in Russian equities, and that he and his family already had an interest in

---

**20.** Because Hay is subject to the RGEs, if Hay's actions violate the Cooperative Agreements, I may determine whether Harvard breached the contract without determining whether the RGEs apply to Shleifer. However, as discussed below, this issue will need to be resolved at trial for the purpose of determining liability under the FCA. During my discussion of the FCA, I will assume for the purposes of preparation for trial that Shleifer is subject to the RGEs.

**21.** Hay and Shleifer also violated the conflict of interest policy in the HIID Overseas Manual, but this does not mean that Harvard violated the Cooperative Agreements. Harvard's obligation under the Cooperative Agreements was to have a conflict of interest policy. That the policy may from time to time have been violated by employees is not in itself a violation of the Cooperative Agreements. I address here only whether Harvard's agents Hay and Shleifer violated the *RGEs*.

the Russian gas company Gazprom, but that he was now considering other investments, including oil stocks.

At a meeting in 1994, Shleifer and Hay discussed the possibility that Hay might invest in Russian equities. Hay reports that, at the meeting, Shleifer mentioned the Gazprom investment:

> He didn't say that the investment in Gazprom was an investment that he made. I understood it to be an investment that he had some interest perhaps through his family or perhaps it was something that Nancy [Zimmerman] had done. It was very vague. But I understood it was something that he would benefit from in some way directly and indirectly.

(Hay 24–25.) Hay agreed to make an investment in Russia. Sometime during the summer of 1994, when Shleifer was in Moscow, Hay gave Shleifer a check for $66,000 to invest in Russian equities. Shleifer deposited the check on September 20, 1994, after he had returned from Moscow.

Shleifer and Hay both contend that an investment never occurred because Shleifer never invested the money. After Shleifer deposited the check, Zimmerman told Shleifer that it was "too late" to invest Hay's money in the oil stocks "because the prices of these stocks were much higher— or some were higher than they were at the time they were acquired." The next time Shleifer spoke with Hay, Hay told Shleifer he might not be interested and Shleifer told him it might be too late anyway.

Several weeks or months later, Shleifer told Hay that Shleifer and Zimmerman might do something else with the money. Shleifer and Zimmerman's bank records show that, in November 1994, an investment that used at least some of Hay's funds was made in a Russian oil company.[22] However, in August 1997 Shleifer returned $66,000 to Hay via Hay's father, Dr. Robert Hay. Shleifer returned the money "because the investigation was going on and I felt that there was no way we were going to do something together investment-wise."

22. As of September 20, 1994, Shleifer's Bay-Bank money market account held $2,787.13. (USA Ex. H at 6.) On that date, Shleifer deposited $72,837.45 into that account, consisting of Hay's $66,000 check and $6,837.45 of other funds. (*Id.* at 1, 6.) Along with interest, this brought the balance in the account to $75,654.89 as of September 26. There were no additional deposits in Shleifer's money market account, other than interest earned, from September through November. (*Id.* at 6–8.) Shleifer and Zimmerman also held a Bay Bank checking account, which had the same account number as the money market account. The checking account contained approximately $26,000 during September, $17,000 in October, and $16,705 as of November 4. (USA Ex. H at 5–8.)

On November 4, $19,000 was wired out of the money market account to an offshore account to purchase shares of a Russian oil company, Varieganneftegas, in Howard Zimmerman's name. (*Id.* at 8, 9; Ex. 829 at 1.)

The government's position is that Shleifer must have used at least some of Hay's money for the November 4 investment, because the balance in the money market account *before* Shleifer deposited Hay's check was well below $19,000. Defendants' position is apparently that the $19,000 wired out of Shleifer's account was Shleifer's money, not Hay's, and that the combination of Shleifer's checking balance and the money market funds unassociated with Hay would have sufficed to cover the $19,000. In other words, Shleifer could have transferred money from one account to the other before the wiring and therefore made an investment entirely free of Hay's funds, but it was simpler and more convenient to skip that step.

While Defendants' version is possible, it is highly improbable. Shleifer kept the two accounts separate, so there is no reason to infer a post-hoc commingling that did not actually occur. I find that no reasonable jury would believe that Shleifer's November 4 investment involved none of Hay's money.

For the purposes of summary judgment, Hay has accepted that the investment was made. He maintains, however, that because the investment was indirect and not within Russia, it did not violate the language of the RGEs. The RGEs prohibit "engaging in" and "making loans or investments to or in any business, profession or occupation in the foreign countries to which the individual is assigned." Hay emphasizes that the RGEs specifically prohibit employees from engaging in any business, profession or occupation "directly *or indirectly,* either in the individual's own name *or in the name or through an agency of another person* " (emphases added), but that the RGEs do not include the same "directly or indirectly" language in the prohibition on "making loans or investments." Whether by mistake or by poor drafting on the government's part, Hay argues, the provision does not include language barring indirect investments.

I disagree. There is no need to reform the RGEs for them to be read to prohibit Hay's investments in oil stocks. Investments are almost inherently "indirect" in that they require the provision of funds to a third party for financial gain. Simply because the money here passed through an additional pair of hands—from Hay to Shleifer—does not take the investment outside the scope of the RGEs. Indeed, the clear purpose of the RGEs was to prohibit exactly this type of transaction. Under Hay's interpretation, however, a grantee employee could "launder" an investment simply by passing it through one who acts as a broker—even if that broker is the Russia Project's Project Director. For an investment to have been outside the scope of the RGEs, the money would have had to undergo a much less conventional route than that traveled here. I find as a matter of law that this investment by Hay violated the RGEs.

### ii. Flemings Russian Securities Fund

■ Around December 1995, Hay invested some $20,000 in the Flemings Russian Securities Fund managed by Elizabeth Hebert. The fund invested only in Russian equities. With Hebert's authorization, Hay used Hebert's address for Fleming investment mailings because, according to Hebert, the fund required an address in the United Kingdom. Hay believes that he probably told Shleifer that he had invested $20,000 in the Flemings Russian Securities Fund; however, Shleifer does not recall whether he learned of Hay's investment in Flemings before the USAID allegations in 1997.

Hay argues that this also was an indirect investment in Russian equities by virtue of the fact that the investment took place in the United Kingdom and involved a British mutual fund. His counsel argued at the hearing on this matter that it was "[a]n investment in the U.K. where a check goes to the U.K. bank, which is what happened here, in a U.K. mutual fund. If that mutual fund then is invested in Russian equities, they're not directly investing." I find this argument unpersuasive. This investment constitutes an investment in a business in Russia, the foreign country to which Hay was assigned, and therefore violates the RGEs. As for Hay's contention that the investment was indirect or otherwise so attenuated from Russia as to be beyond the scope of the RGEs, I recognize there may be investments through a mutual fund or other investment structure where the investor relinquishes control over the investment, such that the character of the funds' investments might conceivably not be attributable to a purchaser in the funds' shares. However, the Flemings Russian Securities Fund, as its name implies, invested only in Russian securities. Hay's investment in the Fund was plainly an investment in Russian business.

### iii. GKOs

■ In July 1996, Hay's father, Dr. Robert Hay, invested $50,000 of Hay's money in Russian government debt instruments known as GKOs. Hay personally made $3,000 from the investment. The investments were made through Zimmerman's company, Farallon Fixed Income Associates.[23]

Before the investment, Hay reviewed the conflict of interest policy in the HIID Overseas Manual and determined that it did not prohibit investment in GKOs. Hay also consulted Melinda Rishkofski, an attorney employed as a project associate on the Russia Project, regarding the GKO investment. She told Hay that the term "government savings certificates," which she said were permissible investments under the HIID Overseas Manual, would cover GKOs.

Rishkofski's understanding at the time, however, was that HIID was not doing work related to Russian GKOs. In fact, the provision of the Overseas Manual that she relied on only exempted investment in government savings certificates "in those countries in which the work of the project itself or any of its members is unrelated in any way to national financial policies and procedures." (Ex. 141.) To the contrary, Hay's work was closely related to national financial policies: Hay admits to involvement in a study of the profits made by broker dealers in the government securities market, and a Legal Reform Project

monthly report for USAID stated that during May 1996 the Project, "[t]ogether with the Central Bank and Arthur Andersen consultants," developed "the framework for unit investment funds activity on GKO/OFZ (short-term state obligations and federal security bonds) market."

Regardless of whether the HIID Overseas Manual may have barred Hay's investment of GKOs, the RGEs do not. GKOs are government debt instruments and therefore, investment in GKOs is an investment in a national government, not a "business, profession or occupation." This is not to say that an investment in GKOs could not logically be barred by a conflict of interest provision. But the plain language of the RGE provision at issue here did not prohibit investment in GKOs.

### iv. Loan to Hebert

■ In July 1996 the Russian Federal Commission for the Securities Market contracted with Forum Financial Group ("Forum") to set up the First Russian Specialized Depository ("FRSD"). Assets invested in Russian mutual funds must be held in such depositories, which execute and record transactions as directed by management companies. Forum experienced difficulties and withdrew. In August 1996 Julia Zagachin, an associate of Hebert's and the manager of Oasis Financial Services ("Oasis"), sought to purchase Forum's interest in the FRSD, but did not have the required $400,000 in capital.[24]

---

**23.** By law, Russian GKOs had to be held by a Russian entity. Dr. Hay's investment was made by Farallon through Zimmerman's Russian company, Novy Mir. The government contends that, because the investment was placed through a Russian for-profit broker, it was an investment in a business (Novy Mir). This is contradictory to the ordinary understanding of what it means to invest *in* something, and conflates the investment with the broker who executes the transaction.

**24.** Zagachin had once worked for the Russia Project. In April 1996 Hay told her that she had to choose between "doing private business and working on the Harvard project." At that time, Hay recalled Zagachin was "on the verge of participating" in a business with Hebert "and so she had to choose to sit one way or the other, which seat she wanted to sit on."

Around August 27, 1996 Hay's father transferred $400,000 to Hebert. According to Hebert, she then loaned the money to Oasis for the purchase of the FRSD. Of Hay's father's $400,0000 loan, $200,000 was Hay's money. His father wrote an IOU to Hay regarding Hay's $200,000. Oasis executed a promissory note to Zagachin dated August 27, 1996 for this amount.

Hay testified that he did not make a loan to FRSD directly because, in part, he was "concerned about what consequences that would have for [him] in terms of [his] ability to continue working on the project." He further testified that such a loan by him "might" violate the Harvard conflict of interest standards "depending on how it was done and how it was approved and so forth." According to Dr. Hay, his son was aware of the loan around the time that it occurred. Hay does not recall when his father told him about the loan, but Hay did not object to his father taking the money from his account.

In late December 1996 Hebert executed a promissory note to Dr. Hay for $400,000. Hay, his father and Hebert have characterized the $400,000 transaction as short term "bridge" financing to cover the time between Forum pulling out its charter capital and the FRSD finding another investor. Hebert, Zagachin, and Zimmerman understood that one of the Farallon entities was prepared to invest in the FRSD, and they needed some additional time to negotiate the terms.

In April 1997 the funds were returned to Hay and his father. Zagachin has stated that at least part of the reason for the repayment of the $400,000 to Hay and his father was the commencement of the USAID investigation. Hay's father also repaid his loan to Hay.

Hay's principal defense is that the loan was a personal loan to his father, which was in turn loaned to Hebert, which was in turn loaned to Oasis—a series of personal loans that ultimately led to a business transaction, not a loan to a business under the RGEs. I find this attempt to "launder" the money through Hay's father and girlfriend ineffective. Hay knew that the purpose of the loan was to provide funding for the capitalization or purchase of the FRSD. Despite the subsequent effort to rewind the investment, I find this transaction violated the RGEs as they applied to Hay.

### b. Shleifer's Investments

I analyze Shleifer's investments assuming *arguendo* that Shleifer was bound by the RGEs. *See supra* Part II.B.3 and note 21.

### i. Renova

■ In July 1994 Shleifer signed a letter agreeing to invest $200,000 in Russia through a company called Renova. The funds were invested in stocks of Russian companies (including the gas company Gazprom and aluminum smelter companies Irkaz, Bransk, and Sayansk) and in GKOs. Shleifer was listed as the beneficiary of these investments in August 1994. Zimmerman was identified as the beneficiary for part of 1996. At some point in 1997 a representative of Renova revised the Shleifer letter agreement to list Zimmerman instead of Shleifer as the investor. Shleifer and Zimmerman received a list of the investments made on their behalf, which included stock in various Russian companies and Russian GKOs.

Harvard conceded at the hearing that it would be fair to conclude that the Renova investments were a violation of the RGEs. Shleifer conceded that it would be fair to conclude that the investments are "indirectly [Shleifer's] investment" through Zimmerman. Based on the evidence be-

fore me, Zimmerman's involvement in this investment does not remove it from the purview of the RGEs. To the extent that the investment included equity securities beyond GKOs, I find that the Renova investment violated the RGEs.

### ii. Purneftgas and Uganskneftegaz stock

■ On August 11, 1994, $165,000 was transferred from Shleifer's joint account with Zimmerman to a seller's offshore bank account for the purchase of shares of Purneftgas, a Russian oil company, in the name of Howard Zimmerman, Nancy Zimmerman's father. Twenty days later, Shleifer wrote a check for $99,000 on his Fidelity mutual fund account and sent it to Howard Zimmerman to purchase shares of the Russian oil and gas company Uganskneftegaz. Howard Zimmerman used the $99,000, plus some of his own money, to purchase 5,000 shares of Uganskneftegaz in his own name.

These investments violated the RGEs. Although Shleifer's money changed hands (in the United States) before being invested in the Russian companies, the evidence shows that Shleifer transferred the money for the purpose of investing in the Russian companies. Given this intent, the investments were prohibited by the RGEs.

### iii. Loan to Hebert

■ Around February 25, 1997 Shleifer transferred $200,000 from a joint account with Zimmerman for the purpose of loaning the money on Zimmerman's behalf to Elizabeth Hebert for Pallada's use. Some of the funds were wired directly to Pallada's landlord at Hebert and Zimmerman's request. Shleifer concedes that he understood the purpose of the loan to Hebert was for Pallada.

According to a promissory note, the money given to Hebert for Pallada was secured by all of Hebert's assets, which included stock in Boston Capital Management, the holding company that owned Pallada. The loan document was executed after the February transfer of funds, but neither Zimmerman nor Hebert can recall when it was signed. This again appears to be an investment in violation of the RGEs. Here Shleifer provided funds to Hebert for the purpose of funding her business, a mutual fund management company doing business in Russia.

### 5. *Disposition*

For the reasons discussed above, I find that Hay made investments that breached the Cooperative Agreements between Harvard and USAID. Consequently, I will grant the government's motion for summary judgment on Count VI, and deny Harvard's motion for summary judgment on the same count.

### C. Count I: False Claims Act, 31 U.S.C. § 3729(a)(1)

A person is liable under section 3729(a)(1) of the False Claims Act if he or she: "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1).

### 1. *Claims for Payment Presented to An Officer of the Government*

■ A "claim" includes "any request or demand, whether under a contract or otherwise, for money or property." 31 U.S.C. § 3729(c). In deciding whether a statement is a claim or demand for payment, "a court should look to see if, within the payment scheme, the statement has the practical purpose and effect, and poses the attendant risk, of inducing wrongful payment." *United States v. Rivera*, 55 F.3d 703, 710 (1st Cir.1995). The term should

be construed broadly to reach "all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert–White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968).

 The USAID payment scheme involved submission of FCTRs, FSRs, and Requests for Funds. USAID's letter of credit instruction manual states that payment approval is dependent on its review of Request for Funds forms or their equivalent. The manual also states that FCTRs "shall be submitted to AID ... on or before their due dates." Failure to submit the "required financial reports," presumably including FCTRs, "may cause" approval of the Request for Funds to be withheld. (Ex. 1086, Doc. No. 218, Tab G at 20.) On the other hand, if proper reports have been filed, then funds will be made available to the recipient organization within two work days of USAID's receipt of the Request for Funds. Throughout the period from 1992 to 1997, USAID routinely responded to OSR's submissions of its Requests for Funds by authorizing the requested drawdowns on the letter of credit within two to four days of receipt.

I find that the FCTRs, the FSRs and the Requests for Funds submitted by OSR to USAID qualify as "claims for payment or approval" under the statute. The Requests for Funds clearly qualify as requests for money or property. And the FCTRs and the FSRs are also claims. These two forms detail the amount of federal funds that, during the previous period, have been drawn on the organization's letter of credit and disbursed. While, strictly speaking, they are backward-looking accounting documents and not invoices, their practical purpose within USAID's payment scheme was to induce and assure future disbursements.

### 2. *False or Fraudulent Claim*

Whether the claims for payment submitted by Harvard were false or fraudulent depends first upon whether Shleifer and Hay's investments were material violations of the Cooperative Agreements. I have determined them to be so with respect to Hay. If it is determined that Shleifer, like Hay, was subject to the RGEs, then his investments also materially violated the agreements.

### a. Falsity

 The FCTRs, FSRs, and Requests for Funds each contain a statement certifying the validity of the data included in the reports; the government argues that these statements render the documents false claims. This "false certification" theory of FCA liability is reasonably well established in the cases, but differs somewhat from the "classic" type of false claim:

> False certification cases differ from mischarging and false negotiation cases. In these cases, parties avail themselves of benefits of some type, such as loan guarantees or agricultural supports, through false statements which create eligibility that otherwise would not exist. Two major questions relating to liability in these cases are: (1) whether the false statement is the cause of the Government's providing the benefit; and (2) whether any relation exists between the subject matter of the false statement and the event triggering [the] Government's loss.

*United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996) (quoting John T. Boese, *Civil False Claims and Qui Tam Actions* 1–29 to 1–30 (1995)), *cert. denied,* 519 U.S. 1115, 117 S.Ct. 958, 136 L.Ed.2d 844 (1997). It is important to remember that "[v]iolations of laws, rules, or regulations alone do not create a cause

of action under the FCA. It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *Hopper*, 91 F.3d at 1266. "[W]here the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997).

i. FCTRs

█ The FCTRs contain the statement:

> I certify to the best of my knowledge and belief that this report is true in all respects and that all disbursements have been made for the purpose and conditions of the grant or agreement.

Defendants argue that, even if Shleifer and Hay's investments violated the Cooperative Agreements, the FCTRs are not false because they certify only that "payments" and "disbursements" provided to Harvard by USAID were made in accordance with the Agreements, while Shleifer and Hay's actions involved "private investments." That is, Harvard did *not* certify that every aspect of the Project was in conformance with the agreement—just the disbursements. Defendants thus view this certification as assuring that USAID money was spent properly and not diverted to improp-

er destinations or wasted on inflated invoices, not that the entire Project was in compliance with every element of the Cooperative Agreements. In defendants' view, the fact that Shleifer and Hay's *investments* may have violated the conditions of the Cooperative Agreements does not render the *disbursements* inconsistent with their "purpose and conditions."

However, Shleifer and Hay's *salaries* were themselves disbursements.[25] The RGEs state that "*no* employee of the grantee shall ... make loans or investments to or in any business ... in the foreign countries to which the individual is assigned," yet HIID had at least one employee, and possibly two, doing precisely that—and it billed (part of) the salaries of those employees to USAID. The conflict provision is not just a restriction on what the grantee's employees may do; it is also a restriction on what type of employees the grantee may employ. Read this way, the RGEs do not just state that employees may not invest, but also that investors may not be employees.[26]

In sum: the FCTRs required a certification that disbursements were "made for the purpose and conditions of the grant or agreement." "Disbursements" presumably includes salaries. Yet Harvard continued to maintain Hay and Shleifer as employees (and pay their salaries with government money) even while they made loans and investments in Russian business. There-

---

**25.** Shleifer's salary was only a USAID disbursement to the extent that he worked on the Russia Project, but that is irrelevant to the present point.

**26.** This interpretation is confirmed by the grantee's obligation to discipline offending employees: "In the event the conduct of any grantee employee is not in accordance with the preceding paragraphs," the grantee is required to consult with the USAID Mission

Director, and recommend a course of action, possibly including termination. (Ex. 15, at 62 §§ 21(e), (g).) The point is that, just as employees are prohibited from investing, grantees are prohibited from continuing to employ employees who do make loans or investments in Russian business. This argument does not turn on whether Harvard knew that Shleifer and Hay were making prohibited investments; that question arises under the "knowingly" element. *See infra* Part II.C.4.

fore, the certifications in the FCTRs were literally false.[27]

ii. Requests for Funds

■ In the Request for Funds, the claimant certifies that "the data reported is correct" and "that the amount for which [the request is] drawn is proper for payment." The claimant also certifies that the document was drawn "in accordance with the terms and conditions of the Letter of Credit." The Letter of Credit in turn certifies that "the payments authorized herein are correct and proper for payment from the appropriations or funds legally committed and available for the purpose, when paid in accordance with the terms and conditions cited above."

It is possible to construct an argument by which the Request for Funds, with or without the Letter of Credit, forms a false claim: since the Request for Funds was approved on the basis of a false FCTR, the payments were not "proper for payment" either under the Request for Funds or the Letter of Credit, and therefore the Request for Funds was not drawn "in accordance with the terms and conditions of the Letter of Credit." However, that interpretation is far too tenuous to form the basis of FCA liability. The certification in the Letter of Credit refers to "the terms and conditions *cited above,*" which appears to refer to certain conditions relating to authenticity of signatures and consent to USAID's preferred method of payment. The Request for Funds certifies only that the request is "in accordance with the terms and conditions of the Letter of Credit," not the underlying agreements. This is quite different from the FCTR, which certifies compliance with "the purpose and conditions of the grant or agreement."

· In sum, neither the Request for Funds nor the Letter of Credit can fairly be read to refer to any terms in the underlying substantive Cooperative Agreements. Therefore, I find that the Requests for Funds were not false claims.

iii. FSRs

■ OSR employees who signed FSRs certified that "to the best of my knowledge and belief [ ] this report is correct and complete and that all outlays and unliquidated obligations are for the purposes set forth in the award documents." Harvard's certifications in the FSRs were not literally false. The "outlays" for Shleifer and Hay's salaries were in fact for the *purposes* set forth in the award documents, even if they were not in accordance with its *conditions.* Therefore, I find that the FSRs were not false claims.

b. Materiality

■ In addition to the FCA's explicit requirements, courts have inferred a requirement that the false statement or claim be material. *Thompson,* 125 F.3d at 902; *but see United States ex rel. Cantekin v. Univ. of Pittsburgh,* 192 F.3d 402, 415 (3d Cir.1999) (questioning whether FCA contains a materiality requirement), *cert. denied,* 531 U.S. 880, 121 S.Ct. 192, 148 L.Ed.2d 133 (2000); James B. Helmer, Jr. & Julie Webster Popham, *Materiality and the False Claims Act,* 71 U. Cin. L.Rev. 839 (2003). The First Circuit has not spoken to this issue in depth. *See United States v. Data Translation, Inc.,* 984 F.2d 1256, 1267 (1st Cir.1992) (noting simply that court need not resolve dispute regarding jury instruction because the "alleged nondisclosure could not have been

27. Because I find the certifications in the FCTRs to be literally false, I need not reach the "implicit falsity" theory that the government advances in the alternative.

material to the price negotiated"). Whether a false statement is material depends on whether it "has a natural tendency to influence agency action or is capable of influencing agency action." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 914 (4th Cir.2003) (quoting *United States ex rel. Berge v. Bd. of Trustees*, 104 F.3d 1453, 1459 (4th Cir. 1997), *cert. denied*, 522 U.S. 916, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997)); *see also United States v. Wells*, 519 U.S. 482, 489, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (applying nearly identical test to a different statute).

■■■ The question of materiality is a mixed question of law and fact. *Harrison*, 352 F.3d at 914. It is not clear, in this circuit, whether primary responsibility for answering this question is for the court or the jury. The Fourth Circuit has explicitly held that the question of materiality is for the court. *Id.; Berge*, 104 F.3d at 1460. The First Circuit has held, in an FCA case but not on this point, that "the primary responsibility for drawing conclusions in the twilight zone between 'fact' and 'law' is at times best placed with the 'factfinder,' whether the factfinder be the trial judge or the jury." *United States v. Rule Indus., Inc.*, 878 F.2d 535, 542 (1st Cir.1989). On the other hand, when the First Circuit had the opportunity to address the materiality question, the panel itself resolved the question on the merits. *See Data Translation*, 984 F.2d at 1267.

The parties' arguments on materiality fall into two general categories: USAID's actual conduct when it learned of the violations, and the text of the relevant documents and the claims submission procedure.

i. Conduct upon learning of the violation

The government argues that the falsity of claims was material because, once USAID learned of the prohibited investments, it suspended the Project. I agree with Harvard that the government somewhat mischaracterizes the history. USAID first learned of the investments at issue in January or February 1997, commenced an investigation soon thereafter, and first informed Harvard of the investigation in April 1997. The precise sequence of events on May 19–20, 1997, are somewhat unclear from the record, but it appears that USAID at that time first temporarily suspended the Project, and then the Russian government suspended it on the same or next day. HIID removed Hay and Shleifer on May 23. However, in the days that followed, USAID expressed a desire to try to salvage the Project. USAID finally terminated the Project on June 6 not because *USAID* wanted to terminate it, but because the *Russian government* did. In short, the government argues that the falsity was material because it prompted USAID to suspend the Project, and Harvard argues that the falsity was immaterial because USAID actually tried to continue the Project after Shleifer and Hay were removed.

It is difficult, on summary judgment, to draw a conclusive inference from this history. On the one hand, USAID's termination of the Project may have been a hasty overreaction to a violation of a relatively minor provision; on the other hand, USAID's attempts to continue the Project with a change of personnel might simply mean that USAID decided that its first priority would be to salvage some of the work to reform the Russian economy, and then deal with its miscreant grantee later. *See Harrison*, 352 F.3d at 915–17 (rejecting argument that, because government continued to fund contractor after discovering false claims, their falsity cannot have been material); *Rule Indus.*, 878 F.2d at

537 (finding defendant liable under FCA for violating Buy America Act certification even though government kept and was satisfied with product supplied); *cf. United States v. Krizek,* 111 F.3d 934, 939 (D.C.Cir.1997) (the question of what constitutes an FCA claim turns on what defendant did, "not on how the government chooses to process the claim," because the "gravamen of these cases is that the focus is on the conduct of the defendant").

Furthermore, there are policy problems inherent in determining materiality from how USAID *actually reacted* when it confirmed the violation, because that begs the question whether USAID's reaction was appropriate. More to the point, if materiality turns on how the government actually reacts to a given violation, then the government can determine materiality on a purely *ad hoc* basis. For these reasons, I decline to base a conclusion of (im)materiality on the government's reaction to the violation.

### ii. Documents and claims procedure

The parties dispute what constitutes a condition of payment under the Cooperative Agreements and/or claims submission procedure, and furthermore, precisely what must be material in order to create FCA liability. If the condition that must be material is the actual provision that Hay and Shleifer violated, i.e., the RGEs' conflict provision, then materiality turns on whether a violation of the conflict provision would cause USAID to refuse payment. If, on the other hand, the condition at issue is the certification of compliance in the FCTRs, then materiality turns on whether failure to submit a signed FCTR would cause USAID to refuse payment. Both sides argue under each theory.

*The conflict provision itself.* The government offers extensive testimony from USAID personnel on the importance of unbiased advice, and statements to the effect that, had they known about Shleifer and Hay's conflicts of interest, they would have insisted that the Project be suspended. (USA Ex. HHH, ¶¶ 3–7.) Defendants challenge the importance to USAID of the particular provision violated. They place great weight on observations such as: USAID did not train HIID staff on the conflict provision; many USAID program staff in Moscow apparently did not know there was a conflict provision in the RGEs (*see, e.g.,* Mosner 20, Coles 9, Ballantyne 347–52, Norris 240); and that the provision is "buried" in "boilerplate" text at the end of the Cooperative Agreements. The government, of course, argues that the conflict provision was very important to it, despite the above, and emphasizes the Project's importance and the need for unbiased advice to the Russian government.

Defendants have a more persuasive argument rooted in the text of the conflict provision. That provision does not specify that payments would be withheld if it were violated—in fact, by specifying employee discipline and potential termination as remedies, it explicitly contemplates that the Project (and payments) would continue even after a violation was discovered. Defendants highlight the contrast between the conflict provision and another clause involving "restricted or ineligible goods and services" such as military equipment or luxury goods. According to that provision, if USAID discovers that the grantee procured such goods or services, then the grantee must "refund to AID the entire amount of the reimbursement." (Ex. 15 at 41.) Defendants reason that USAID knew how to make a violation material—by specifying disgorgement as the remedy—or, in the language of the FCA cases, how to make compliance with a condition into a condition of payment. For instance, in *United States v. Emons Industries, Inc.,*

406 F.Supp. 355, 356 (S.D.N.Y.1976), USAID required a supplier to execute a "Supplier's Certificate" obligating the supplier "to make 'appropriate refund'" to USAID in the event of a breach or of "any 'false certification or representation'" in the Certificate itself. If USAID had required HIID to execute such a certificate, then materiality would be indisputable. Since USAID did not do so with the conflict provision, on this logic, the conflict provision was a "condition of participation," not a condition of payment. *United States ex rel. Joslin v. Cmty. Home Health of Md., Inc.*, 984 F.Supp. 374, 385 (D.Md.1997); *cf. United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 676 (5th Cir.2003) (en banc) (where the government contract "explicitly addresse[d] a breach of this nature and provides a specific remedy," the claimants "continue[d] to be entitled to receive housing assistance payments during the corrective action period," and therefore claims during this period were not false claims). Indeed, defendants argue, under the government's theory, *every* violation of a provision in the Cooperative Agreements by a Project employee, no matter how minor the provision, would turn that month's FCTR into a false claim; this, defendants argue, cannot be the law.

*The certifications in the FCTRs.* Both Cooperative Agreements state that:

This Agreement is made to the Recipient on condition that the funds will be administered in accordance with the terms and conditions as set forth in ... Enclosure 3 entitled "Standard Prohibitions[."]

While this may seem purely formal, several Harvard witnesses (from both HIID and OSR) testified that they understood that, by submitting financial reports and requests for payment—which were expressly required by the Cooperative Agreements—Harvard was representing to USAID that the funds were expended according to the conditions of the Cooperative Agreements. (Irwin 75–78; Mora 49–52; Cimon 44–46; Perkins 51–56.)

The importance of the FCTRs is hotly disputed. First, Harvard argues that FCTRs were not even required under the first Cooperative Agreement. The provision in the first Cooperative Agreement detailing the submission of FCTRs "is applicable only when ... the total *advances* under all the grantee's cost-reimbursement contracts and assistance instruments with AID equal or exceed $50,000 per annum." [28] (Ex. 15, at 28 (emphasis added).) Harvard argues that its agreements with USAID, including both Cooperative Agreements, were reimbursement systems, not advance payment systems, and therefore FCTRs were not required because there were no "advances." (Mora Aff., Harvard Supp. Mem., Doc. No. 218, Tab D, ¶¶ 8–10; Dubois Dep., *id.* Tab B, at 44.) On the other hand, USAID accountant James DuBois states that FCTRs were required for any payment under a letter of credit system, whether the payments came as reimbursements or advances. (*See* Dubois Dep., *id.* Tab B, at 112–13.)

DuBois also avers that FCTRs were always reviewed by USAID accounting staff, and that if an FCTR was submitted *with-*

---

28. The second Cooperative Agreement did not explicitly mention FCTRs, but incorporated 22 C.F.R. § 226. That section provided in part: "Recipients shall be required to submit not more than the original and two copies of the [FCTR] 15 calendar days following the end of each quarter." 22 C.F.R. § 226.52(a)(2)(iv) (1995). Based on language earlier in the regulation, Harvard claims that this only applies to advance payment systems, not reimbursement systems. *See id.* § 226.52(a)(2)(i) ("When funds are advanced to recipients USAID shall require each recipient to submit the [FCTR] ...").

*out* the signed certification, it would be returned to the grantee. This in turn would delay authorization of the next Request for Funds, and hence the actual payment. In other words, according to DuBois, if Harvard had not signed the certification in the FCTRs, then it probably would not have been paid by the government. Indeed, USAID's instructions for letter of credit recipients warn: "Failure to submit the required financial reports when due may cause [USAID] to withhold approval of 'Requests for Funds.'" (Ex. 1086, Harvard Supp. Mem., Doc. No. 218, Tab G, at 20.)

Harvard disputes this, and points to several instances where USAID authorized payments to Harvard after an FCTR had been received, but before it had been entered into the computer system against which a USAID Certifying Officer would supposedly check for properly completed FCTRs. (*See, e.g., id.* 140–43.) This is an arguable point, but of limited import. On the one hand, DuBois admitted that he knew of no instance of a Certifying Officer approving a Harvard Request for Funds based on checking anything other than the computer system. (*Id.* at 124–27.) This suggests that USAID may have often done precisely what DuBois said it would not do: authorize payments without checking for proper FCTRs.

On the other hand, it is not clear why USAID's failure to enter a handful of FCTRs into the computer system should be dispositive. The letter of credit system required the grantee to submit an FCTR, and failure to timely submit an FCTR certainly posed a *risk* (of which the grantee had been warned) of non-payment. If Harvard's strict standards for materiality were applied, then an FCA defendant could always achieve summary judgment simply by finding one or more instances where the government bumbled its inter-

nal accounting procedures. The government's burden of materiality is not so strict; it must prove that the false statement "has a natural *tendency* to influence agency action or is *capable* of influencing agency action." *Harrison,* 176 F.3d at 785 (emphases added). *Cf. United States v. First Nat'l Bank of Cicero,* 957 F.2d 1362 (7th Cir.1992) (government must show that it would not have made a payment "but for" the false statement, but need not show that subject matter of the false statement was source of the government's loss).

Finally, defendants emphasize that most USAID program staff, both in the United States and in Moscow, were unaware that FCTRs even existed. Conversely, of course, DuBois and other accounting staff were ignorant of the RGEs. These points are true but irrelevant. USAID is a large government bureaucracy, and it is unnecessary for each employee to understand every provision binding a grantee, or even how a substantive provision relates to a certification in a financial form. USAID program staff did not need to know about FCTRs, and USAID accounting staff did not need to know about RGEs. Evidently whoever designed the Cooperative Agreements thought it important to include a conflict of interest provision, and whoever designed the FCTRs included a certification that all disbursements were for the purposes and conditions of the agreement. From there, it sufficed for USAID to instruct its accounting staff to withhold payment if the most recent FCTR had not been signed. *But see Southland Mgmt. Corp.,* 326 F.3d at 681 (Jones, J., specially concurring) (ascribing no value to HUD employee's testimony regarding materiality of certifications where he testified only that vouchers would have been rejected if unsigned, but he did not actually read or otherwise know contents of certifications, and decision to terminate relationship was

made by project manager based on substantive criteria).

*Conclusion.* I conclude that the materiality of the false claims does not turn on how "important" the conflict provision appeared to be, but more narrowly. on whether a failure to certify that the disbursements met the conditions of the Cooperative Agreements could have caused USAID to refuse payment. On this point, I am not persuaded by defendants' arguments.

Evidence of the government's actual *conduct* is less useful for FCA purposes than evidence of the government's legal *rights.* I decline to adopt rules of law that would enable the government to determine materiality by its reaction to either a violation of the RGEs, or a failure to submit properly signed financial forms. Materiality must turn on how USAID was *authorized* to respond to such failures, or else violation of identical provisions in separate cases could have different materiality results based on the predilections of particular program or accounting staff. I accept Harvard's point that a Request for Funds was, on occasion, approved without a review of the previous month's FCTR. However, there appears to be no genuine dispute that, had Harvard repeatedly failed to file FCTRs, or filed them substantially late, or filed them without the certification, eventually USAID would have denied Harvard's Requests for Funds. The fact that USAID sometimes approved Requests for Funds without checking FCTRs does not mean that the government waived its authority to insist on properly certified (and true) FCTRs; at best, it is an argument for reducing damages.

### 3. *Presented or Caused To Be Presented*

Harvard, through OSR, regularly presented to USAID the three types of claims for payment—FCTRs, FSRs, and Requests for Funds. Since the claims in the FCTRs were materially false, Harvard meets the "presented" requirement. Shleifer and Hay did not personally present any claims to the government, but the government argues that their actions "caused" the presentation of false claims.[29]

A person need not directly submit claims to the government to be liable. *United States v. Bornstein,* 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) ("It is settled that the [FCA] ... gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to the Government."); *United States v. Mackby,* 261 F.3d 821, 828 (9th Cir.2001) (owner of physical therapy clinic liable under FCA where he instructed clinic and billing service to use incorrect provider identification number). Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish "causation" under the FCA. *United States ex rel. Piacentile v. Wolk,* Civ. No. 93–5773, 1995 WL 20833, *3–4 (E.D.Pa. Jan.17, 1995) (granting defendant's motion to dismiss an FCA claim where he did not affirmatively misrepresent any fact to the government, but merely failed to inform the government of false statements made by another and to take action to ensure the practice was discontinued).

To "cause" the presentation of false claims under the FCA, some degree of participation in the claims process is

---

**29.** Again, in this section I assume *arguendo* that the claims for payment were false due to the actions of both Shleifer and Hay.

required. As defendants acknowledge, actually delegating the submission of claims to one who then files a false claim suffices. *Mackby*, 261 F.3d at 827 (doctor caused false claims to be submitted to Medicare where he instructed his clinic's billing service to put false information on Medicare claims); *Krizek*, 111 F.3d at 943 (defendant liable where he delegated to his wife authority to submit claims on his behalf and did not review them); *see also United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544–45, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (construing earlier version of FCA to reach "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government").

Whether lesser involvement suffices is not clear from the cases. Some courts have insisted that the defendant have some role in the claim process. *See United States ex rel. Kinney v. Hennepin County Med. Ctr.*, 2001 WL 964011, *9 (D.Minn. Aug 22, 2001) (granting summary judgment in favor of defendant that presented improper bills for services to the actual false claimant, because the defendant had "no control over the content of the claims" and no "apparent right to review the claim forms being submitted"). On the other hand, most courts agree that the FCA covers "indirect mulcting of the government." *United States v. Lagerbusch*, 361 F.2d 449, 449 (3d Cir.1966) (per curiam) (affirming civil FCA verdict against defendant who made false representations to a private corporation, where the government paid the corporation's operating costs, including the sums improperly obtained by the defendant).

■ Under this broader interpretation, a defendant may be liable if it operates under a policy that causes others to pres-

ent false claims to the government. *United States v. Teeven*, 862 F.Supp. 1200, 1223 (D.Del.1992) (defendants liable under FCA where their policy to withhold refunds due to students resulted in inflated default claims to the government, even though "[d]efendants arguably neither made nor caused to be made any false statements or certifications to the Department of Education"). Where the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes "a course of conduct that allowed fraudulent claims to be presented to the federal government." *United States ex rel. Long v. SCS Bus. & Tech. Inst.*, 999 F.Supp. 78, 91 (D.D.C.1998), *rev'd on other grounds*, 173 F.3d 870 (D.C.Cir.1999), *amended*, 173 F.3d 890, *cert. denied*, 530 U.S. 1202, 120 S.Ct. 2194, 147 L.Ed.2d 231 (2000). Of course, even under the broadest interpretation, the defendant must know that claims are being submitted to the United States. *United States v. Scolnick*, 219 F.Supp. 408, 411 (D.Mass.1963) (Ford, J.) (entering judgment for one defendant because there was "no evidence that [he] had any knowledge of the transaction between the United States and [the falsely claiming corporation]"), *aff'd*, 331 F.2d 598 (1st Cir.1964).

■ Here, there is sufficient evidence to tie Hay to the claims process. While he did not file or review FCTRs, FSRs, or Requests for Funds, he approved Russia Project expenses, and was aware that the Project was funded by USAID. Hay signed invoices for payments due to ILBE, a USAID-funded subcontractor, to indicate that he reviewed them and agreed that they were proper and appropriately chargeable to HIID. In addition, Grant

Felgenhauer, a project assistant on the Russia Project, regularly created monthly and quarterly reports of the Legal Reform Project, sent drafts to Hay, and solicited comments from Hay regarding the reports.

It was foreseeable that the invoices and reports that Hay saw would be submitted to the government.[30] Hay was aware from the Project's inception that it was funded by USAID. Furthermore, Hay was aware that Harvard provided USAID with quarterly reports on the Project. (Hay 408–11, 1412–15.) Because he submitted to HIID invoices for payments due to ILBE, he could expect that, as USAID was funding the Project, Harvard would bill USAID for the funds. OSR's submission of the claims to USAID was thus foreseeable and so was not an "intervening force" that would break the chain of causation. *See United States ex rel. Franklin v. Parke–Davis*, 147 F.Supp.2d 39, 52 (D.Mass.2001) (Saris, J.) (physicians who wrote prescriptions and the pharmacists who filled them were not an "intervening force" between a drug company's promotion of off-label uses and the submission of false claims); *see also Cantekin*, 192 F.3d at 416 (failure of NIH program office to forward belated letter disclosing grantee's industry funding to appropriate NIH officials was not an intervening cause).

Hay charges that "absent a proper application of the element of proximate cause, the FCA would be effectively boundless, enabling the government (and scores of *qui tam* plaintiffs) to allege a FCA violation every time that there was a breach of a workplace norm by anyone on a project that receives government funding." Hay's concern about the bounds of the FCA is addressed by the materiality requirement, and by the fact that mere knowledge of a "breach of a workplace norm," without a role in the claims process, does not "cause" false claims to be submitted.

That said, if the basis for the allegation that Hay "cause[d] to be presented ... a false or fraudulent claim for payment or approval" is Hay's approval of invoices and financial reports, then the government must show that the claims that Hay caused to be presented are the claims that were false. But the government need not show that the specific expenses that Hay approved violated the Cooperative Agreements. Harvard certified in the FCTRs that "*all* disbursements have been made for the purpose and conditions of the grant or agreement" (emphasis added), and as I have noted, Hay's salary was itself a disbursement. Therefore, Hay caused a false FCTR to be presented in any month during which both (1) Hay violated the RGEs, and (2) Hay approved some invoice or expense that would eventually be charged to USAID.[31]

■■■■ By contrast, I find that Shleifer did not cause false claims to be submitted. He did not take any actions to have claims submitted to the government. The United States has not adduced any evidence that Shleifer approved expenses. In June 1995 Shleifer did assist in the submission to

---

**30.** The purpose of identifying particular sets of invoices and reports is not to suggest that those particular expenses were false claims, or that if they were, they were the only ones. Rather, it is only to demonstrate that Hay was engaged in the claims process, and that his approval of Project expenses, combined with HIID and OSR's institutional structure, establishes that he in effect delegated authority to OSR to file claims with the government.

**31.** Again, the invoices that Hay approved were not necessarily themselves false claims, and in fact, most probably were not. However, they provide a nexus between the submission of a false FCTR and Hay's role in causing claims to be presented to USAID.

USAID of the Technical Proposal for the Second Cooperative Agreement, and he stipulates, for the purposes of summary judgment, that he authorized the signature. That statement, however, did not "cause" a false claim to be submitted to the government.[32]

Thus, even if Shleifer knew or should have known about the claims process, and even if he knew that false claims were going to be submitted, his failure to take steps to ensure that Harvard discontinued the submission of the claims does not constitute "causation" under the False Claims Act. Because there is insufficient evidence to find that Shleifer "presented or caused to be presented" false claims, I will grant Shleifer's motion for summary judgment on Count I.

### 4. *Knowingly*

██ A defendant is only liable under the FCA if he *"knowingly* presents, or causes to be presented ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (emphasis added). In the context of the False Claims Act, "knowingly" means that "a person, with respect to information—(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." *Id.* § 3729(b). "However, innocent mistakes and negligence are not offenses under the [FCA]." *United States v. Taber Extrusions, LP,* 341 F.3d 843, 845 (8th Cir.2003) (internal quotation marks omitted).

As a preliminary matter, it is not necessary for FCA liability that the defendant "know" every detail of the false claim.

For instance, the government need not prove that any defendant knew that, or how, FCTRs were submitted, nor that FCTRs contained an express certification. Rather, it must simply show that each defendant "knew" (again, including deliberate ignorance or reckless disregard) (1) that he was presenting, or causing to be presented, a claim for payment or approval, and (2) that the claim was false or fraudulent. *Cf. Harrison,* 352 F.3d at 918-19 (rejecting "single actor" theory of knowledge according to which "a single employee must know both the wrongful conduct and the certification requirement").

#### a. Hay

Hay disputes that he ever actually knew of the RGEs. He said he does not believe that he ever received either Cooperative Agreement, and does not recall reading any USAID regulations, policies or rules concerning investments in Russia, nor reviewing any portion of either Cooperative Agreement.

Nevertheless, Hay learned of USAID funding of the Russia Project when the project began. On December 29, 1992 Kumins sent Hay a copy of his employment agreement, effective January 1, 1993. Kumins's letter highlighted the existence of various USAID rules governing the project, but did not specifically mention the RGEs. Hay does not recall receiving the letter, but recalls that the rules were identified to him as those that he needed to know. He read the employment agreement when he signed it, and understood that he was to provide unbiased, impartial advice in his work as a Harvard employee.

---

**32.** Whether the 1995 Conflict of Interest Statement was a statement "used to get a false claim paid or approved by the Government," under section (a)(2) of the FCA, is discussed below in Part D.

In June 1994 a copy of the HIID conflict of interest policy was faxed from Rosanne Kumins's office in Cambridge to Hay's office in Moscow. Hay called Kumins to discuss the conflict of interest policy because he did not understand whether it applied to any investment, or only those investments where there was a conflict of interest. Hay recalls asking Kumins to send a copy of the conflict of interest policy from the HIID Overseas Manual. He believes that he had already seen it before asking her to send it, and understood that the policy applied to him. On July 8, 1994 Kumins sent Hay a copy of an amendment to the First Cooperative Agreement and told Hay that his "responsibility was to meet the reporting requirements under Section VI." Among the reporting requirements listed under Section VI were "monthly budget status reports which detail total funds expended under each line item."

Hay was also copied on an October 9, 1995 memo from Rishkofski that explained that the "USAID/HIID Cooperative Agreement" sets out certain "obligations." The RGEs were listed as standard provisions for grantees, but were not discussed in the memo. In May and July 1996 Hay sent memoranda to USAID seeking amendments to the Cooperative Agreements. Given this record, a reasonable jury could only find that Hay was aware of the Cooperative Agreements between Harvard and USAID funding his work, and of the existence (if not the details) of USAID regulations governing USAID-funded work and expenditures.

Hay testified that he understood that the Cooperative Agreements placed some obligations on Harvard to USAID, but he did not know specifically what those might be. He generally understood that USAID could terminate Harvard's funding subject to the terms of the agreement. Hay was aware that Harvard provided USAID with quarterly reports on the Project.

Despite this, Hay argues that Harvard personnel approved of his conduct and that this approval put the question of the RGEs' application to him in dispute. Among the personnel Hay mentions is Shleifer. But Shleifer, who himself engaged in apparent self dealing, could not validate or provide rationalization for Hay's activities. Hay also points to Rishkofski's conclusion that the HIID Overseas Manual did not bar investments in GKOs. But Hay's investments in GKOs did not violate the RGEs, so her approval (which was based on incomplete information) had no bearing on this issue. Finally, that Harvard invested in Russia is irrelevant to Hay's knowledge of the RGEs' application to him.

If the standard were actual knowledge, I would deny the government's motion for summary judgment against Hay on the grounds that a reasonable jury might find that Hay did not, in fact, read the RGEs. However, the government need not prove actual knowledge, only reckless disregard. In light of the information regarding Hay's knowledge of the Cooperative Agreements, especially in light of the fact that Hay—a Harvard Law School graduate—was the Project's General Director, I find that a reasonable jury could only conclude that Hay was at least acting in reckless disregard of the existence of the RGEs and of their application to him. Thus, I find he had knowledge of the falsity of the information in the claims that he caused to be presented to USAID.

b. Harvard

 By virtue of signing the agreements and certifying its understanding of them, Harvard is properly charged with knowledge of the RGEs' existence. The thornier question is whether Harvard

knew that the RGEs had been violated. Based on the information that Harvard did not know (and should not be held reckless in not knowing) about Hay and Shleifer's investment and business activities, I find that Harvard did not know that the statements it submitted to USAID were false.

### i. Knowledge of materiality

Harvard argues that, not only must it have known that the claims were false, and that this falsity must have been material, but also that Harvard must have *known the falsity was material.* For this theory, it relies on *United States ex rel. Siewick v. Jamieson Science & Engineering, Inc.*, 214 F.3d 1372 (D.C.Cir.2000), a False Claims Act case in which the D.C. Circuit held that a defendant could not have known that a violation of a statutory provision could void its contract with the government. The relator in *Jamieson* argued that a contractor's monthly invoices were false claims because of a violation of 18 U.S.C. § 207, which prohibits "revolving door" abuses by former government employees. 214 F.3d at 1374. Notably, that provision was not mentioned in the contract or program requirements, and there was no evidence that the government ever required the contractor to certify compliance with § 207 as a condition of its contract. *Id.* at 1374–76. Since the relator plainly could not show a false certification with a contractual condition, he argued that a § 207 violation rendered the contract void. The court held that the violation did not *void* the contract, but left open whether it would render the contract *void-able.* Harvard leans on language noting that, even if the contract *would* have been voidable, there was no way for the contractor to have known that a violation of a statute not actually mentioned in the contract, and with which the contractor was not required to certify compliance, could make the contract voidable. *Id.* at 1376–78.

*Jamieson* does not support Harvard's theory, because the most important fact in *Jamieson* is that the contractor was not required to certify compliance with the provision violated. Had it been required to so certify, *Jamieson* would have been a run-of-the-mill false certification case. Unlike *Jamieson*, where § 207 was not even alluded to in the contract, here the conflict provision was explicitly stated in the Cooperative Agreements with which Harvard certified compliance. Since Harvard made a false certification, the government's burden is not to prove that Harvard knew that USAID would terminate the Project, but simply that it knew its claims were false.

### ii. Knowledge of falsity

 The government argues that Harvard's failure to prevent or address Shleifer and Hay's conflicts of interest constitutes reckless disregard.[33] The government has highlighted a series of "red flags," which it contends should have alerted the University that it was submitting fraudulent claims to USAID. For the most part, these red flags involve concerns that various Project employees had raised—to each other, and to Hay and

---

**33.** The government also argues that Harvard should be charged or imputed with the collective knowledge of Hay and Shleifer, as employees of Harvard. Because Hay and Shleifer were not acting with an intent to benefit Harvard in engaging in the acts that gave rise to the false claims, they were not acting in the scope of employment, which is a requirement for imputing the collective knowledge of employees to a corporation. *See generally United States v. Bank of New England*, 821 F.2d 844, 854–56 (1st Cir.1987) ("[K]nowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation."), *cert. denied*, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987).

Shleifer—about apparent improprieties on the Project. Most of these improprieties are not relevant to this case. The only "flag" that was actually brought to the attention of Harvard employees outside the Project, and that was more than tangentially relevant to these proceedings, was that Pallada was the first company to register its mutual fund. The rest of the so-called red flags consisted largely of intra-office concern regarding alleged favoritism, such as the provision of gifts and services to Russian government officials and their families, which are not matters directly at issue in the present litigation.[34]

It is true that Harvard certified to the federal government that federal funds were disbursed in accordance with the conditions of the Cooperative Agreements. In making this certification, Harvard did have an obligation to determine whether it was making, and then submitting, a false claim for payment. While Shleifer and Hay may profess ignorance of the details of the Cooperative Agreements, Harvard as an institution certainly cannot. A more careful employer might have, for instance, distributed a short memorandum explaining the conflicts provision, and perhaps even required Project staff (whether "employees" or "consultants") to fill out a disclosure form. If the applicable legal standard in this case were negligent supervision, the government would have a better case against Harvard.

However, that is not the standard; the government must prove knowledge (actual or constructive) or reckless disregard. Even taking the government's "warning signs" as a whole, it is unreasonable to expect that, from rumor-like allegations of impropriety and favoritism, Harvard could

have known or recklessly disregarded the fact that it was submitting claims that were false by virtue of Hay and Shleifer's personal investment activity. Similarly, it is unreasonable to find that Harvard was in reckless disregard, or was willfully ignorant, because it did not adequately supervise or investigate Hay and Shleifer's personal investment activity.

The facts here distinguish themselves from another false claims case where a supervisor purposefully turned a blind eye to the falsity of claims submitted. In *United States v. Cabrera–Diaz*, 106 F.Supp.2d 234 (D.P.R.2000), the court held a doctor liable for the submission of false claims for payment under the Medicare program. An audit of the doctor's records revealed that in over four hundred of the sampled claims, "time had been overstated, falsely reported, unsupported or undocumented." *Id.* at 238. The court found that this demonstrated that the doctor and his billing secretary "had either actual knowledge or constructive knowledge of the falsity, in that they acted in reckless disregard of the truth, or certified information ... in support of the claims with neither personal knowledge of its accuracy nor reasonable investigative efforts." *Id.* The court remarked that "either they acted with actual knowledge that the information was false, or hid[ ] behind a shield of self-imposed ignorance." *Id.* The court concluded that the doctor could not escape liability "on the basis of lack of knowledge of the fraud when he has *purposefully* turn[ed] the blind eye to the conduct of ... his subordinate." *Id.* at 238 (emphasis added).

This case differs from *Cabrera–Diaz* because Harvard neither knew that the infor-

---

**34.** For example, the Project paid for the chairman of the Russian SEC and his wife to *fly* to Idaho for a part-work, part-vacation trip, and Shleifer paid for training for the chairman's wife at his own personal expense. While this may be ethically dubious, the circumstances do not involve a violation of the conflict provision.

mation it submitted was false, nor hid behind a "shield of self-imposed ignorance." Harvard had an obligation to take reasonable steps to determine whether the certifications properly represented that the Russia Project was operating in accordance with the Cooperative Agreements. This obligation, however, was not so far-reaching as to warrant investigation and supervision of employees' every activity, without information that would warrant such scrutiny. Since the government has not shown that Harvard had sufficient information to alert it to the fact that false claims were being submitted, I find that Harvard did not have knowledge of the falsity of the claims it submitted to USAID.

### iii. Vicarious liability

The government argues that, even if Harvard did not have knowledge that the claims it submitted were false, it is vicariously liable for Hay and Shleifer's violations of the False Claims Act because Hay and Shleifer acted with Harvard's apparent authority. Vicarious liability does not apply here, however, for two reasons.

First, apparent authority analysis is flatly inapplicable because Harvard itself presented false statements to USAID. The apparent authority question arises when an employee, apparently acting on behalf of the company, presents a false claim to the government. For example, in *United States v. O'Connell*, 890 F.2d 563 (1st Cir. 1989), an employer was held liable under the FCA for its general manager's scheme to defraud the government. The employee, on his own initiative, "conceived, hatched and perpetrated" the fraud using company checks and invoices. *Id.* at 564. "[d]uring the perpetuation of the fraud," the employee "at all times ... held himself out to" federal and state governmental entities "to be acting for and on behalf of" the company. *Id.* at 567. The First Circuit held that "a corporation should be held liable under the False Claims Act for the fraud of an agent who acts with apparent authority even if the corporation received no benefit from the agent's fraud." *Id.* at 569.[35]

In this case, however, Hay and Shleifer's alleged wrongdoing does not include the presentation of any false claims to the government. Harvard presented the claim to the government. Of course, Harvard did so through employees, but the authority of its OSR employees to present claims to the government is not at issue.

Second, apparent authority only applies where a person holds himself out to a third party as an agent of a principal. On such facts, the principal is held liable for the agent's fraud against the third-party plaintiff because "the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of business provided to him." *In re Atlantic Fin. Mgmt., Inc.*, 784 F.2d 29, 32 (1st Cir.1986) (quoting *Restatement (Second) of Agency* § 261). For instance, in *O'Connell*, the defendant's employee was able to defraud the government by appearing (to the government) to act on behalf of his employer. *See also Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 566 & n. 5, 102 S.Ct. 1935, 72

---

**35.** The reference to "no benefit" is in contrast with the standard, non-FCA doctrine of apparent authority, where an employer is liable under an apparent authority theory "only if its employees were acting within the scope of their authority and for the purpose of benefiting the corporation." *United States v. Hangar One, Inc.*, 563 F.2d 1155, 1158 (5th Cir. 1977) (upholding vicarious FCA liability when low-level employee acted within the scope of employment to benefit employer).

L.Ed.2d 330 (1982) (summarizing apparent authority doctrine and quoting Restatement § 261).

Here, neither Hay nor Shleifer held himself out to the government as an agent of Harvard while conducting their personal investment activity that rendered the claims false. Although they may have used the knowledge or contacts they gained as Harvard employees to make or protect the investments, they made no representations to the government that led to the violation of the RGEs. Thus, the doctrine of apparent authority is not relevant here.

### 5. *Disposition*

For the reasons discussed above, I find that Hay knowingly caused false FCTRs to be presented. However, I find that there is insufficient evidence upon which a jury could find that Shleifer presented or caused to be presented any claims to the United States, or that, assuming the claims were false as to Shleifer, he knew of their falsity. Finally, I find that there is insufficient evidence upon which a jury could find that Harvard knew of the falsity of the claims. Therefore, for Count I, I will grant the government's motion for summary judgment against Hay only, grant Shleifer's and Harvard's motions for summary judgment, and deny all other motions.

### D. Count II: False Claims Act, 31 U.S.C. § 3729(a)(2)

Under § 3729(a)(2), a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government" violates the FCA. 31 U.S.C. § 3729(a)(2).

### 1. *Harvard and Hay*

■ Incorporating the discussions above in Part C, I find that Harvard did not knowingly make false records or statements. Nor did Hay, although he knowingly "caused to be made or used" false records or statements. Those records or statements included FCTRs containing false certifications, which had the object of getting claims paid or approved by the government. Hay caused them to be made or used by violating the RGEs without disclosure to Harvard.[36] I note that Hay's liability under § 3729(a)(2) is broader than his liability under § 3729(a)(1). Section 3729(a)(1) required Hay to cause a claim to be presented, and is therefore tied to his role in the claims process. In contrast, § 3729(a)(2) only required Hay to cause a false statement to be made or used, and therefore applies even where Hay had no role in the claims process. Consequently, Hay is liable under § 3729(a)(2) for any FCTR or Request for Funds made or used during a month in which he had investments in violation of the RGEs, even during periods of time when he was not involved in the claims process.

### 2. *Shleifer*

■ Shleifer argues that even if he was bound by the RGEs, and even if he caused false claims to be submitted, he did not know of their falsity. Whether Shleifer knew of their falsity depends primarily

---

**36.** Again, disclosure to Shleifer, who himself invested vigorously in Russia and solicited Hay for several of these investments, does not absolve Hay. To have prevented his violation of the RGEs from forming the basis of a false claim, Hay would, at a minimum, have had to make disclosure to someone at Harvard whose hands were not themselves soiled. Hay considered disclosing his investment in the FRSD to Harvard counsel Greg Poppe, but apparently decided against it.

on two questions: whether he knew that claims would be submitted to the United States, and whether he knew that he was bound by the RGEs.[37] Shleifer claims that he did not know of the existence of the RGEs and, when he did learn of them, he did not know that he was subject to them. Thus, he contends, he could not have ever been acting in reckless disregard of the falsity of the claims submitted to USAID.

Shleifer was aware of USAID funding from the Project's inception. It appears that he was sent versions of the Cooperative Agreements in 1992 and 1995. He says he does not recall reading the Cooperative Agreements or having actual knowledge of their contents before the USAID investigation, which began in 1997.[38]

As discussed above, in June 1995, Shleifer assisted in the submission to USAID of the Technical Proposal for the Second Cooperative Agreement. The Technical Proposal included a Conflict of Interest Statement, which was submitted to USAID under a cover page signed by Shleifer. The Statement provides, in part:

> As a non-profit, academic institution, Harvard is committed to maintaining an objective and unbiased role in advising the officials of foreign governments. In Russia, HIID has been particularly successful in gaining the trust and respect of host country counterparts as demonstrated by the key role Professor Andrei Shleifer and his team of associates have played in the design and implementation of Russia's mass privatization program.... In substance and principle, HIID already provides impartial over-

sight under its current Cooperative Agreement.

As Project Director, and Principal Investigator as of October 1995, Shleifer had an obligation to ensure the Project was carried out in compliance with the Cooperative Agreements. The Principal Investigator handbook clearly establishes this obligation:

> The terms "principal investigator," PI, and "project director" are used to designate that individual who shall have responsibility for seeing that a sponsored project is carried out in compliance with the terms, conditions and policies of both the sponsor and the university.... The PI has primary responsibility for the management of sponsored projects. With this responsibility comes the obligation to plan and manage each project with care and diligence, to adhere to all terms and conditions of the award, and to adequately document all expenditures in accordance with sponsor regulations... PI's must understand that proper conduct of project management rests on their shoulders.

Shleifer does not recall receiving the Handbook and the record does not reveal whether it was provided to him.

During the summer of 1996, HIID attorney Michael Butler informed Shleifer that the Cooperative Agreements included conflicts of interest provisions concerning investment activities in Russia. At the time, it was Shleifer's understanding that the provisions did not apply to him because they only applied to employees, and he considered himself a consultant.

---

37. As noted above, for at least some of Shleifer's investments (e.g., Renova), Shleifer concedes that, if he was bound by the RGEs, the investments were in violation.

38. As of at least late 1995 or early 1996, Shleifer was aware of and received the HIID

conflict of interest policy in the HIID Overseas Manual. (Shleifer 35–38.) He did not consider himself bound by the policy, however, because it applied to employees and he did not consider himself an employee. (Shleifer 48–55.)

Shleifer argues that he could not be expected to interpret the RGEs as applying to him when their interpretation is a "very close question." It is evident, however, that by mid–1996, Shleifer had actual knowledge of the RGEs. Furthermore, from October 1995 on, during the time of the Renova investments and his loan to Hebert, Shleifer was, at least, derelict in his duty as Project Director and Principal Investigator to familiarize himself with and abide by the RGEs.

Since I cannot find, on summary judgment, that Shleifer was *actually* bound by the RGEs, it follows that I cannot find, on summary judgment, that he *knew* that he was bound by them. Assuming that he was actually so bound, whether he knew he was (or was in reckless disregard of whether he was) is primarily a question of Shleifer's credibility. I find that there is a genuine dispute of fact as to whether Shleifer knew of the falsity of the statements.[39]

### 3. *Disposition*

For the reasons stated above, for Count II, I will grant the government's motion for summary judgment against Hay only, grant Harvard's motion for summary judgment, and deny all other motions.

### E. Count III: False Claims Act, 31 U.S.C. § 3729(a)(3)

■■■ A person is liable under § 3729(a)(3) where he or she "conspires to

defraud the Government by getting a false or fraudulent claim allowed or paid." To prove liability, a plaintiff must show: "(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; and (2) one or more conspirators performed any act to effect the object of the conspiracy." *United States ex rel. Wilkins v. N. Am. Constr. Corp.*, 173 F.Supp.2d 601, 639 n. 33 (S.D.Tex.2001). General civil conspiracy principles apply to § 3729(a)(3). *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n. 3 (7th Cir.1999); *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir.1991).

### 1. *Shleifer and Hay*

■■■ At the outset, it is important to note that Shleifer can be liable under this section even if he was not bound by the RGEs himself, and even if he is not liable under §§ 3729(a)(1)-(2). Assuming only Hay caused the submission of false claims or the making of false statements, Shleifer can still be held liable under (a)(3) if he conspired to defraud the United States by getting those claims allowed or paid.

The government argues that, while funded by USAID to advise the Russian SEC, Shleifer and Hay agreed to invest in Russian equities and to assist Zimmerman, Hebert and others in financing and launching the FRSD and Pallada as the first such entities licensed by the Russian SEC. The government contends that the undisputed facts show at least a working understand-

---

**39.** Other documents that Shleifer signed or approved do not create FCA liability. Shleifer did sign a "Modification of Cooperative Agreement" in 1996, with his signature under the statement "Recipient is required to sign this document to reconfirm its agreement with the changes effected herein." In 1993 and 1994 he signed and approved, as Principal Investigator, at least one subcontract and amendments to it under the Cooperative Agreement. But the 1995 Conflict of Interest Statement, which Shleifer signed, does not descend to the level of falsity, nor could have it induced payment. The Cooperative Agreement modification is not false because Shleifer's signature merely confirmed the changes to the Cooperative Agreement. The subcontractor approvals were not false statements because they were not made to get a false claim paid, nor did Shleifer make any false statements on the approval forms, which merely approved the use of a subcontractor.

ing among Shleifer and Hay to finance and assist in Pallada's launch, and that they performed numerous acts to further this plan.

First, the government points to the $66,000 investment that Shleifer made on Hay's behalf. Second, the government argues that Shleifer, Hay, Zimmerman, and Hebert at least implicitly agreed to work together to launch and finance Hebert and Zagachin's businesses. Evidence of that plan, the government argues, can be found in Shleifer and Hay's discussions regarding the investment of funds in the FRSD or Pallada; a May 16, 1996 draft memorandum (written by Hebert and reviewed by Hay) addressed to Zimmerman's business colleague, Thomas Steyer ("the Steyer Memo"); and the decision not to disclose the investments to Project attorney Michael Butler.

The government cites email messages, meetings, and discussions about investing Shleifer, Zimmerman, or Hay's funds in the FRSD or Pallada. These discussions apparently culminated in the $200,000 loan from Hay to Hebert in August 1996 and the $200,000 loan from Shleifer to Hebert in February 1997.

The Steyer Memo seeks an investment in the "Specialized Depository" as a package with an investment in Hebert's Pallada mutual fund management company. It was apparently never sent to or received by Steyer. It is, however, probative of Hay's intent regarding the proposed business activity. The revised version of the Steyer Memo states that the Specialized Depository would:

> be established with the active involvement of the Russian legal team that the Federal Commission entrusted with the drafting of the original mutual fund regulation.... [W]e are likely to get a license before anyone else which will give a significant first mover advantage....

> Given this project's relationship with the Commission, any other attempts by definition will be in a catchup mode... In the short to medium term our advantage comes from the fact that the regulator wants us to be first.... [W]e are establishing the Specialized Depository simultaneously with the establishment of a fund management company ... [that] will be managed by Elizabeth Hebert.... [t]he Specialized Depository and the Fund Management Company are being offered to you as a package. This is for several reasons.... Second, the Federal Commission will not license the Specialized Depository except as a package with its first client. For this reason we think that it is important to have control over the first client to ensure that there are no problems or friction in the set up stage.

The memorandum, which Hebert originally drafted, is written in the first person. Hay concedes that the Steyer Memo "may" have been intended to be issued in his name.

Hay looked at the initial draft and told Hebert that it did not state that the Russian SEC and Hay were involved in the project. According to Hebert, after reviewing her draft, Hay responded that Zimmerman and Steyer were "looking for his opinion and his support of the project and that [Hebert] should take that into account" in drafting the memo. After receiving Hay's comments, Hebert revised the memorandum to indicate the Commission's and Hay's support, and gave the revised version to Hay. It is not clear whether he reviewed the later version.

A version of the Steyer Memo was faxed to Nancy Zimmerman's office in Boston from ILBE's Moscow office around May 1996. A version of the Steyer Memo may have been faxed to Shleifer, but Shleifer does not recall receiving the fax. Some

time before August 1996, Steyer, Zimmerman, Hebert, and Hay had a telephone conference and discussed a potential investment in Pallada or the FRSD.

A memorandum similar to the Steyer Memo (but not addressed to Steyer) appears to have been faxed by Hebert to Zimmerman and from Zimmerman to a company called AEW, owned by one Peter Aldrich. Hebert and Zimmerman do not recall faxing the memorandum. Hay encouraged Aldrich to invest in the FRSD and told him that the Commission encouraged investment in the mutual fund industry including Hebert's mutual fund and the FRSD. In August 1996 Hay asked Shleifer and Zimmerman to provide financial assistance to the FRSD and both said they were "ready to help." Afterwards, Hay and Zimmerman emailed regarding the structure of the transaction.

This activity was partially disclosed to HIID counsel. In fall 1996 or winter 1997 Shleifer and attorney Michael Butler discussed whether Zimmerman would have to disclose an investment in or loan to the FRSD, if she chose to engage in such activities. Butler advised that if Zimmerman or her companies invested in the FRSD, Shleifer should speak with Harvard counsel Greg Poppe. Hay believed that Zimmerman had decided not to invest in the FRSD and that the HIID conflict of interest rules had factored into that decision. Shleifer alleges that no investment occurred and that Butler did not say that

Zimmerman's business was prohibited by USAID or HIID rules. Butler explains that he advised against an investment in the FRSD because "it just wouldn't have looked right, an investment in a major project of the Securities Commission when Andrei [Shleifer] was an advisor to them. I thought for appearance's sake, even though it would have been legal for Nancy [Zimmerman] to do it, I thought it would have been inadvisable." Tellingly, Shleifer did not ask Butler whether *he* could invest in Russia.

I find that this evidence shows, as a matter of law, that Shleifer and Hay acted in agreement, explicit or implicit, to make loans to Hebert in 1996 and 1997 to finance the FRSD. These actions caused the submission of false claims. *See supra* Part II.C. Therefore, I find that Shleifer and Hay violated § 3729(a)(3).

### 2. *Harvard*

 Harvard cannot be held liable under § 3729(a)(3) for two reasons. First, there is no evidence of a spoken or unspoken agreement between Harvard and the individual defendants to seek the government's payment of false claims.[40] Second, Harvard cannot be held vicariously liable for the actions of Hay and Shleifer because, although they arguably acted with apparent authority in promoting the FRSD, they never acted with apparent authority towards the plaintiff here—the government. Fraud that either of the two

---

**40.** Because I find that there was no agreement, I need not resolve whether the intracorporate conspiracy doctrine bars suit against Harvard. That doctrine holds a corporation cannot conspire with its own employees or agents, because that would be conspiring with itself. *Rice v. President and Fellows of Harvard Coll.*, 663 F.2d 336, 338 (1st Cir.1981). However, it is questionable whether it would apply to an FCA case. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166,

121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) (doctrine, born of antitrust law, "turns on specific antitrust objectives").

Even if the doctrine applies to this case, it would not bar suit against Shleifer and Hay, because their activities were not authorized by Harvard. . *Huntingdon Life Sci., Inc. v. Rokke*, 986 F.Supp. 982, 991 (E.D.Va.1997) (doctrine inapplicable "where the acts of the officers or agents were unauthorized by the corporate defendant").

may have engaged in towards third parties under Harvard's apparent authority is not at issue in the present litigation. *Cf. Forum Fin. Group v. President & Fellows of Harvard Coll.*, 2002 WL 31175454 (D.Me. Sept.30, 2002).

For the reasons stated above, on Count III I will grant the government's motion for summary judgment against Hay and Shleifer, grant Harvard's motion for summary judgment, and deny all other motions.

## F. Counts IV and VIII: Common Law Fraud and Fraudulent Inducement

■ The government argues that Hay, Shleifer, and Harvard are liable for common law fraud because they made or caused to be made fraudulent material representations to the United States with actual knowledge of their fraudulent nature or, at least, with reckless disregard for their truth. The government alleges that the United States reasonably relied upon these material misrepresentations, as a result of which USAID-funded resources were diverted to improper purposes and the United States suffered damages. Specifically, the government argues that defendants caused the United States to enter into amendments to the first Cooperative Agreement, and the entire second Cooperative Agreement, based upon the fraudulent representation that the Cooperative Agreements' requirements and specifications for work performed were being met.

■ The standards for common law fraud and fraudulent inducement are the same: (1) the statement was knowingly false, (2) defendants made the statement with the intent to deceive, (3) the statement was material, (4) plaintiff reasonably

relied on the statement, and (5) plaintiff was injured as a result of its reliance. *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1st Cir.1986) (applying Massachusetts law); *Elias Bros. Rests., Inc. v. Acorn Enter., Inc.*, 831 F.Supp. 920, 922–23 (D.Mass.1993) (same); *Danca v. Taunton Savings Bank*, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982).[41]

### 1. False Representations Made to the United States

#### a. Representations by Shleifer and Hay

The government argues that both Shleifer and Hay made false representations to USAID. Shleifer reviewed and approved the false conflict of interest statement which was submitted to USAID under a cover letter signed with his name, although he disputes that the signature is his. The government argues that, by signing the cover page of the June 1995 Technical Proposal, which included the Conflict of Interest Statement, Shleifer made an explicit false representation to the United States. (Ex. 16.) As discussed above, the Conflict of Interest statement provides, *inter alia*, that "[i]n substance and principle, HIID already provides impartial oversight under its current cooperative Agreement." (Ex. 16 at 2.) This statement is a representation made to the United States. However, as discussed above, this statement is not literally false, and is too vague to form the basis for FCA liability.

The government argues that Hay made false statements to USAID because he signed invoices and approved expenses for inclusion on Harvard's ledgers, and thus ultimately on the FCTRs, while in violation

41. Massachusetts state law governs here. *See Atherton v. FDIC*, 519 U.S. 213, 214, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997) ("Normally, a federal court may fashion federal common-law rules only upon a specific showing that the use of state law will create a significant conflict with, or threat to, some federal policy or interest."); *Wilkins*, 173 F.Supp.2d at 645.

of the Cooperative Agreements. However, the government has not shown that Hay made any false statements *directly to* the United States. Hay did sign multiple invoices and approve expenses that ultimately caused Harvard to submit false statements to USAID, but Hay himself made no false statements directly to the government. Liability for common law fraud, unlike the False Claims Act, does not attach where a defendant merely "causes" a false statement to be made. Thus, neither Hay nor Shleifer made false representations to the government.

b. Failure to Disclose by Shleifer and Hay

Second, the government argues that Shleifer and Hay had a duty to disclose their conflicts to USAID and that their failure to do so was a false representation to the United States. This argument fails as well.

█ Under Massachusetts law, "[t]here can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose." *Royal Bus. Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1063 (1st Cir.1991); *Solomon v. Birger,* 19 Mass. App.Ct. 634, 639, 477 N.E.2d 137, *rev. denied,* 395 Mass. 1103, 481 N.E.2d 198 (1985). The United States fails to identify sufficient evidence from which I could conclude that a duty to disclose arose.

The government argues, without explaining, that this duty to disclose arose from the fact that defendants Hay and Shleifer were responsible for administering millions of dollars of USAID assistance funds. It also contends that a duty to disclose arose from their express agreement in their employment contracts to "be responsible" to USAID and "faithfully and fully to the best of [their] ability [ ] render high level professional services" to USAID. The government argues that

"faithfully" must mean "without hidden financial conflicts of interest." Again, this general statement does not create a duty to disclose. The words "faithfully," "fully," and "high level professional services," are too indefinite to create the specific duty to disclose for which the government argues in this case.

Finally, the government argues that Hay was called "chief of party," and thus he was "specifically charged with disclosing to USAID any violations of its conflict of interest policy." According to the Cooperative Agreements, "[i]n the event that the conduct of any recipient employee is not in accordance with preceding paragraphs, the recipient's chief of party shall consult with the USAID Mission Director and the employee involved and shall recommend to the recipient a course of action with regard to such employee." There appears to be a factual dispute as to whether Hay was the "chief of party" under the Cooperative Agreements. As proof that Hay was the "chief of party," the government cites evidence that Rosanne Kumins at HIID generally referred to Hay as "chief of party." Hay, however, does not recall the term "chief of party" being used. In any event, a designation which implies a general duty of supervision over subordinate employees does not constitute a duty to disclose the *supervisor's* activities.

c. Material False Representations by Harvard

Harvard itself submitted numerous claims and documentation to USAID in connection with the Russia Project. As discussed in the context of the False Claims Act, those claims included materially false statements. *See supra* Part II.C. I find those statements are materially false

in the context of common law fraud as well.[42]

### 2. *Knowledge of Falsity*

As discussed above, Harvard did not have knowledge that the claims it submitted were false. *See supra* Part II.C. Nor can knowledge be imputed to Harvard through Shleifer and Hay. The knowledge of Shleifer and Hay concerning the falsity of the statements to the government cannot be imputed to Harvard because Harvard did not engage in fraud itself.

▮▮▮ Under Massachusetts law, had Shleifer and Hay engaged in fraudulent acts from which Harvard knowingly benefitted, their knowledge regarding the false representations at issue would be imputed to Harvard. The general rule in Massachusetts is that a principal is liable for an agent's knowledge acquired in the scope of employment. *Sunrise Props., Inc. v. Bacon*, 425 Mass. 63, 679 N.E.2d 540 (1997). In contrast, an agent's knowledge is not imputable to a principal where the agent is "engaged in an independent fraudulent act." *Nat' Credit Union Admin. v. Ticor Title Ins. Co.*, 873 F.Supp. 718, 726 (D.Mass.1995) (Saris, J.) (applying Massachusetts law). Based on *Sunrise Properties,* even if Shleifer and Hay had made fraudulent representations to the government, their knowledge would not have been imputed to Harvard because they were not acting in the scope of employment.

Because I find that Shleifer and Hay did not directly make false representations to the government and that Harvard did not have knowledge of the falsity of its own statements, I do not need to reach the issues of intent, reliance, or injury.[43]

Therefore, on Counts IV and VIII, I will grant all defendants' motions for summary judgment, and deny the government's motion as to the same counts.

### III. CONCLUSION

For the reasons set forth more fully above:

1. On Count I (§ 3729(a)(1)), the government's summary judgment motion is GRANTED against Hay, and DENIED against Shleifer and Harvard; Shleifer and Harvard's summary judgment motions are

---

**42.** Under Massachusetts law, a plaintiff demonstrates materiality by establishing that the misrepresentation was one of the principal grounds that caused the plaintiff "to take the particular action that the wrongdoer intended he should take as a result of such representations and that otherwise he would not have taken such action." *Nat'l Car Rental Sys., Inc. v. Mills Transfer Co.*, 7 Mass.App.Ct. 850, 852, 384 N.E.2d 1263 (1979) (citation omitted). This definition of materiality is similar to the definition of materiality under the FCA.

**43.** Nor must I decide whether the statute of limitations has expired with respect to Shleifer. Shleifer argues that the statute of limitations for the torts of common law fraud and fraudulent inducement expired before the United States brought suit against him. 28 U.S.C. § 2415(b). The government brought suit against Shleifer over three years after the time Shleifer alleges that the dispute must

have accrued, May 1997. Although the government and Shleifer entered into an agreement to toll the statute of limitations in June 2000, Shleifer argues that the statute had already expired at that point.

The government argues that the statute of limitations here is six years, not three. 28 U.S.C. § 2415(b) provides for a general three-year statute of limitations on tort claims brought by the United States. However, 28 U.S.C. § 2415(b) provides that tort claims brought for "diversion of money paid under a grant program" have a six-year statute of limitations. Shleifer contends that this provision does not apply because the project at issue was not a "grant program," in that it used cooperative agreements. In light of the fact that the government's common law fraud claim fails against Shleifer on the merits, I need not resolve this dispute.

GRANTED; and Hay's summary judgment motion is DENIED.

2. On Count II (§ 3729(a)(2)), the government's summary judgment motion is GRANTED against Hay, and DENIED against Shleifer and Harvard; Shleifer's summary judgment motion is DENIED; Harvard's summary judgment motion is GRANTED; and Hay's summary judgment motion is DENIED.

3. On Count III (§ 3729(a)(3)), the government's summary judgment motion is GRANTED against Hay and Shleifer; Hay and Shleifer's summary judgment motions are DENIED; and Harvard's summary judgment motion is GRANTED.

4. On Count IV (fraud), the government's summary judgment motion is DENIED as to all defendants; and Hay, Shleifer, and Harvard's summary judgment motions are GRANTED.

5. On Count VI (breach of contract), the government's summary judgment motion is GRANTED against Harvard; and Harvard's summary judgment motion is DENIED.

6. On Count VIII (fraudulent inducement), the government's summary judgment motion is DENIED as to all defendants; and Hay, Shleifer, and Harvard's summary judgment motions are GRANTED.

The Clerk shall set this matter for a status conference at which the procedures to bring this case to judgment, including the issue of damages previously briefed by the government and Harvard, *see* Note 2 *supra,* will be addressed.