# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-2226

_____

Hanover Insurance Company, a New Hampshire Corporation

*Plaintiff - Appellee*

v.

Dunbar Mechanical Contractors, LLC, doing business as Dunbar Mechanical
Contractors, Inc.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

_____

Submitted: January 16, 2020
Filed: July 9, 2020

_____

Before COLLOTON, SHEPHERD, and ERICKSON, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Dunbar Mechanical Contractors, LLC (Dunbar), a Service Disabled Veteran
Owned Small Business (SDVOSB), was awarded an Army Corps of Engineers ditch
and tributary project in Arkansas. Dunbar hired a subcontractor, Harding Enterprises
LLC (Harding Enterprises), to work on this project. When Harding Enterprises

defaulted, Dunbar made a demand under the bond guaranteed by Hanover Insurance Company (Hanover). Hanover denied the claim on the basis that the subcontract agreement between Dunbar and Harding Enterprises violated federal law because it subcontracted over 85% of the work on the project to a non-qualifying entity. Hanover filed suit seeking a declaration that it had no obligations under the bond and seeking to have the bond rescinded based on illegality of the subcontract. The district court, converting Hanover's motion for judgment on the pleadings into a motion for summary judgment, granted the motion, agreeing that the subcontract violated federal law. Dunbar appeals, arguing the district court erred in its determination that the subcontract agreement represented over 85% of the work on the project. Having jurisdiction under 28 U.S.C. § 1291, we reverse.

I.

In 2013, Dunbar bid on an Army Corps of Engineers contract for construction of a ditch and tributary project in Mississippi County, Arkansas. This project was a Service Disabled Veteran Set-Aside Project, which required a bidder to qualify as an SDVOSB to be eligible to receive the prime contract. On December 18, 2013, Dunbar was awarded the project, with the bid price of $2,047,455.74. The terms of the prime contract between Dunbar and the Army Corps of Engineers provided that Dunbar was responsible for:

> furnishing all plant labor and materials necessary for but not limited to channel clearing and cleanout within Ditch 27 . . . , Pemiscot Bayou/ Ditch 36/Ditch37 . . . , and Ditch 33 . . . , seeding, mulching and environmental protection. This project also consists of establishment of turf within the right-of-way limits, including the berm, excavated material embankment, and anywhere above top bank that is denuded of grass due to construction activities.

R. Doc. 27-1, at 1.

-2-

On the same day that Dunbar was awarded the prime contract, it entered into a subcontract agreement with Harding Enterprises.  Under the terms of the subcontract, Dunbar agreed to pay Harding Enterprises $1,794,136.00 "as full compensation for all the work" described in the agreement.  R. Doc. 27-4, at 1.  The subcontract detailed Harding Enterprises' "Scope of Work" as follows: "Subcontractor agrees to perform the following work: Provide all work that was provided in the proposal."  R. Doc. 27-4, at 1.  The subcontract also contained a provision regarding "Changes to the Scope of Work," which provides:

> The Contractor may, at any time after the execution of this Agreement, without invalidating this Agreement or any bonds, if any, or security furnished hereunder, and without notice to the sureties, add to, reduce or omit Subcontractors's scope of work; all such changes shall be authorized by written change order.  Reductions or omissions shall be given in writing to Subcontractor not later than five (5) days prior to when the Work that has been reduced or omitted was scheduled to begin.  When work is omitted or reduced, in whole or part, the Contractor shall pay, subject to the provisions of this Agreement, for all work actually performed.  Subcontractor is not entitled to compensation or damage for any loss, including loss of profit or overhead relating to reduced or omitted work.  All claims for unexpected conditions or delays must be given with in [sic] 5 days after subcontractor recognizes the condition or event giving rise to the claim.  Except in an emergency, notice shall be given before proceeding with the Work.

R. Doc. 27-4, at 3.

Roughly one month after entering into the subcontract with Harding Enterprises, Dunbar entered into a separate employment agreement with Gregg Harding, who was the sole member of Harding Enterprises.  Dunbar hired Harding to serve as the project manager for the ditch project for compensation of $62,000.00.  Hanover subsequently issued a subcontract performance bond and a subcontract payment bond guaranteeing Harding Enterprises' performance.  The bond was in the amount of the full stated value

of the subcontract, $1,794,136.00, and listed Harding Enterprises as the Principal and Dunbar as the Obligee.

On April 20, 2017, Dunbar informed Hanover that it was terminating Harding Enterprises as the subcontractor and Gregg Harding as the project manager based on Harding Enterprises' alleged default under the subcontract agreement. Dunbar demanded performance on the bond and Hanover undertook an investigation of Dunbar's claim. During this investigation, Hanover discovered that Dunbar had subcontracted more than 85% of the work under the prime contract to Harding Enterprises, which did not qualify as an SDVOSB. Because the federal regulation governing the government award of a contract to an SDVOSB requires the SDVOSB to perform at least 15% of the cost of the prime contract, Hanover determined that Dunbar was in violation of this requirement and denied Dunbar's claim on this basis.

Hanover then filed a declaratory judgment action seeking a declaration that Hanover had no obligations to Dunbar under the bond and seeking rescission of the bond based on the illegality of the underlying subcontract. Hanover filed a motion for judgment on the pleadings, which, after notifying the parties, the district court converted into a motion for summary judgment. The district court granted Hanover's motion for summary judgment, concluding that the subcontract between Dunbar and Harding Enterprises undisputedly violated federal law. The district court reached this determination by dividing the amount Dunbar was to pay Harding Enterprises under the subcontract by the total amount of the prime contract, which demonstrated that Dunbar had contracted to pay Harding Enterprises 87.6% of the total prime contract price. The district court then added to the equation the additional $62,000.00 that was to be paid to Gregg Harding as project manager under the employment agreement, concluding that the total amount Dunbar was to pay Harding Enterprises and Gregg Harding combined represented 90.66% of the value of the prime contract. Because this percentage exceeds the federally mandated 85% limit on work the SDVOSB could subcontract, the district court concluded that the subcontract was illegal. The district

court noted that illegality provides grounds for rescinding a contract and ruled that Hanover was not required to fulfill any of its obligations under the bond. In closing, the district court noted that there may be potential liability for Hanover under the False Claims Act (FCA) if it were to perform in "furtherance of an illegal subcontract for work on a Government project." R. Doc. 32, at 6. The district court entered judgment accordingly, and Dunbar appeals.

## II.

Dunbar asserts that the district court erroneously granted summary judgment to Hanover because the district court could not conclusively determine whether Dunbar performed the requisite percentage of work on the project until the project was completed. "We review de novo a district court's grant of summary judgment, viewing all evidence and drawing all reasonable inferences in favor of the nonmoving party." Odom v. Kaizer, 864 F.3d 920, 921 (8th Cir. 2017) (internal quotation marks omitted). Summary judgment is appropriate where "there is no genuine dispute of material fact and the prevailing party is entitled to judgment as a matter of law." Id. (quoting Jones v. Frost, 770 F.3d 1183, 1185 (8th Cir. 2014)).

We begin, as we must, with the regulation that imposes certain obligations on SDVOSBs that are awarded government contracts. Under 13 C.F.R. § 125.6(b)(2) (2008), "An [SDVOSB] prime contractor can subcontract part of an SDVO contract . . . provided . . . [i]n the case of a contract for general construction, the [SDVOSB] spends at least 15% of the cost of contract performance incurred for personnel on the concern's employees or the employees of other [SDVOSBs.]"[1] In examining this

---

[1]Both the parties rely on a version of 13 C.F.R. § 125.6(a)(3) that went into effect on June 30, 2016 and provides, in relevant part that "[i]n the case of a contract for general construction, [the SDVOSB] will not pay more than 85% of the amount paid by the government to . . . firms that are not similarly situated. Any work that a

regulation, "[w]e look to see 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" Solis v. Summit Contractors, Inc., 558 F.3d 815, 823 (8th Cir. 2009) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)). The language of the regulation assesses compliance with the regulation in terms of the amount an SDVOSB spends relative to the cost of contract performance; an SDVOSB may subcontract part of the prime contract so long as it "spends at least 15% of the cost of contract performance incurred for personnel on the concern's employees or the employees of other [SDVOSBs.]" The use of spending relative to the cost of contract performance as the benchmark for assessing compliance with the regulation plainly demonstrates that a final determination may not be made until all performance of the contract is completed. Making a determination at any earlier point would be premature. If the regulation were intended to apply prospectively, it could have been drafted to say so, specifically by, for example, prohibiting an SDVOSB from agreeing to subcontract more than 85% of the "cost of the contract performance incurred for personnel." But the regulation ties the requirement to spending, which can only be assessed after contract performance has been concluded. Thus, when an SDVOSB is awarded a government contract, by conclusion of performance under the contract, the SDVOSB must have spent at least 15% of the prime contract cost on its own employees or employees of other SDVOSBs.

Based upon the language of the regulation, we agree with Dunbar that the district court erroneously concluded that the subcontract was undisputedly in violation of this regulation because the percentage that Dunbar spent on contract performance relative to the prime contract price could not be conclusively ascertained until

_____

similarly situated subcontractor further subcontracts will count towards the 85% subcontract amount that cannot be exceeded. Cost of materials are excluded and not considered to be subcontracted." However, as the prime contract was entered into on December 18, 2013, the appropriate provision, as stated in the body of the opinion, is 13 C.F.R. § 125.6(b)(2), which was in effect until December 30, 2013.

conclusion of performance of the prime contract. Hanover and the district court approached this issue as a simple math problem requiring nothing more than division of the subcontract amount and project management fee by the prime contract amount. But this is an oversimplification and does not take into account the terms of the subcontract, which allowed Dunbar to unilaterally change the scope of work at any point during the subcontract. Thus, even if Dunbar had initially subcontracted away more work than it was required to retain to satisfy the 15% performance threshold, that balance could have subsequently been altered by Dunbar's changes to the scope of work. And, as this was a right that Dunbar held for the duration of the project, it simply could not be determined until the end of contract performance whether the subcontract violated the terms of 13 C.F.R. § 125.6(b)(2). In short, there simply was insufficient evidence in the summary judgment record to determine whether, as a matter of law, Dunbar would satisfy the 15% performance requirement for SDVOSBs who obtain government contracts.

We also conclude that the potential that Hanover may have liability under the FCA if it were to perform under the bond does not justify discharging Hanover from its obligations and rescinding the contract. In support of its conclusion to the contrary, the district court identified a single federal district court case from the District of Columbia, United States ex rel. Scollick v. Narula, No. 14-CV-01339-RCL, 2017 WL 3268857 (D.D.C. July 31, 2017). That case involved FCA claims arising from the award of a government contract to, among others, SDVOSBs, but was decided in the context of a motion for leave to amend the complaint, which considered only whether the plaintiff's allegations were sufficient to warrant allowing amendment. See id. at *1-*2. And, in any event, the allegations in Narula contained indicators of a concerted scheme to defraud—false certification of status as SDVOSBs, false claims regarding past performance, concealment or falsification of records regarding management and employees of the companies at issue—that are simply not present here. See id. at *2. Without further support for the notion that performing its obligations under the bond subjects Hanover to FCA liability, a single case with factually distinct circumstances

-7-

is an insufficient basis upon which to warrant the relief Hanover seeks: discharge from its obligations and rescission based on illegality. And Hanover is not without recourse if it believes the bond presents potential FCA liability; Hanover could either pay the obligee and, having satisfied its obligations, remove itself entirely from any further involvement, or perform under the bond while giving notice to the government of the potential for false claims if there is no further modification of contract performance. See United States v. President & Fellows of Harvard Coll., 323 F. Supp. 2d 151, 187 (D. Mass. 2004) ("Where the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant *or disclose the false claims to the United States*, the defendant's ostrich-like behavior itself becomes a course of conduct that allowed fraudulent claims to be presented to the federal government." (emphasis added) (internal quotation marks omitted)). We note that, while this case comes to us in the form of a challenge to summary judgment, the district court converted what was originally a motion for judgment on the pleadings into a motion for summary judgment. Although the district court notified the parties of this conversion and allowed them to file supplemental materials, the ruling was based on a limited summary judgment record. We thus make no prediction about what further factual development on remand might show with regard to this argument.

III.

For the foregoing reasons, we reverse the judgment of the district court and remand to the district court for further proceedings.

_____